[Civ. No. 21634. Third Dist. Jan. 14, 1985.]

DUANE LOWE, as Sheriff, etc., Plaintiff and Appellant, v.
CIVIL SERVICE COMMISSION OF SACRAMENTO COUNTY,
Defendant and Respondent;
JERRY KEE SHUN LEE, JR., Real Party in Interest and Appellant.

**[Opinion certified for partial publication.*]**

*See footnote 1, *post*, page 671.

COUNSEL

Vantassell, Fornasero & Vantassell, Vance J. Vantassell and Joseph M. Fornasero for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

David P. Mastagni and Richard J. Chiurazzi for Real Party in Interest and Appellant.

OPINION

**PUGLIA, P. J.**—Dismissed from his classified position as a Sacramento County deputy sheriff, Jerry Kee Shun Lee, Jr. (Lee) appealed to the county civil service commission (Commission). Following an administrative hearing, the Commission adopted findings proposed by the administrative law judge to the effect that Lee had been wilfully disobedient, incompetent, and a discredit to his employment in violation of subparagraphs (m), (b), and (p) of section 11.4 of the county civil service rules. The Commission concluded, however, that the dismissal action taken by the sheriff was excessive under the circumstances and reduced the penalty to a suspension without pay from August 14, 1980 through March 12, 1981. (Sacramento County Civ. Serv. rule 11.12, subpara. (c)(2).)

The sheriff petitioned the superior court for a writ of administrative mandamus to review the Commission's decision. (Code Civ. Proc., § 1094.5.) Exercising its independent judgment on the evidence, the superior court found that the Commission abused its discretion in reinstating Lee rather

than affirming the sheriff's discharge. In the judgment which followed, the court issued a peremptory writ of mandate commanding the Commission to set aside its suspension order and "to reconsider its action in light of [the] court's findings of fact and conclusions of law, . . ."

In his appeal from that judgment, Lee takes issue chiefly with the trial court's application of the independent judgment test. The sheriff also appeals, contending the court erred in refusing discovery and admission of new evidence not presented at the administrative hearing. The sheriff also seeks reimbursement for the salary paid Lee during the pendency of the mandamus proceeding.

As appears, we resolve the appeal in favor of Lee. Accordingly, we shall reverse and direct the trial court to enter judgment denying the sheriff's writ petition.[1]

As set forth by the Commission, the factual circumstances giving rise to the disciplinary action and penalty were as follows: "At approximately 1:30 a.m. on June 1, 1980, [Lee], while off duty, was driving on freeway Interstate 80 in his personal passenger car. His wife and a good friend were seated in the front seat with him. [Lee] entered Interstate 80 at Watt Avenue and was traveling in a northeast direction intending to take the Antelope Road off ramp to get home. . . .

"At the Greenback Lane on ramp, [Lee's] vehicle nearly collided with another vehicle which entered the freeway at Greenback Lane and cut in front of [Lee's] vehicle. The other vehicle was a Mazda sports car, nearly new and without license plates. [Lee] observed that for a short time thereafter the Mazda was traveling in an erratic fashion and [Lee] thought perhaps the driver was under the influence of alcoholic beverages. . . .

"[Lee] drove his vehicle alongside the passenger's side of the other vehicle but somewhat to the rear. [Lee] turned on his interior light and facing the passenger in the other vehicle, said in substance, 'I'm a deputy sheriff—slow down or stop the vehicle.' Mr. Glass, the passenger in the other vehicle, told the driver, Mr. Richie, what he had seen and what he had heard [Lee] say. Neither Glass nor Richie believed that [Lee] was a law enforcement officer and Richie decided not to stop. . . .

"Somewhere between Greenback Lane and the Auburn Boulevard off ramp [Lee] again pulled alongside the passenger's side of the Mazda sports

---

[1]Parts III, IV and V of this opinion deal with and reject the contentions of the sheriff on his appeal. None of those parts satisfies the criteria for publication (rule 976, Cal. Rules of Court) and therefore are not certified for publication (rule 976.1, Cal. Rules of Court).

car. He identified himself verbally and ordered the other vehicle to stop or slow. Once again, there was a negative response from the occupants of the Mazda sports car. On one of the two occasions, the men 'flipped off' [Lee].
. . .

"Between Greenback Lane and Antelope Road on Interstate 80, near a weigh-station off ramp, the driver of the Mazda veered toward [Lee's] car in an attempt to scare him off. [Lee] took evasive action and drove into the weigh-station. He looked for a law enforcement officer to whom he could report the incident. Seeing none, he returned to the freeway. At this point, [Lee] was not sure whether the driver of the Mazda had intended to force him off the road or was driving under the influence of alcoholic beverages.
. . .

"[Lee] continued on Interstate 80 past the Antelope road exit, his normal exit to go home, and followed the Mazda on the freeway. The Mazda left the freeway at Auburn Boulevard off ramp and turned right on Auburn Boulevard in a southbound direction. Less than a mile down Auburn Boulevard, Richie pulled the Mazda into a K-Mart parking lot. After driving around the lot for a short time, he pointed the car towards Auburn Boulevard with the headlights off. The purpose was to evade [Lee]. . . .

"[Lee] left the freeway at Auburn Boulevard and also turned right at the intersection of the off ramp and Auburn Boulevard and headed in a southbound direction. [Lee] was intending to go home. [Lee] felt that the Mazda was no longer a danger to other vehicles as it had left the freeway.

"When [Lee's] vehicle reached the entrance to the K-Mart parking lot, the Mazda pulled out of the lot directly in front of [Lee's] car. Richie then made an abrupt right turn on Auburn Boulevard and headed southbound down the middle of Auburn Boulevard for a short distance. Then Richie made an abrupt U-turn and faced north towards [Lee's] vehicle on the wrong side of the road. [Lee] passed to the right of the Mazda and then himself made a U-turn and went after the Mazda which was now traveling northbound on Auburn Boulevard. [Lee's] stated intent was to arrest the occupant of the Mazda for felonious assault based on the near collision at the K-Mart parking lot. However, it is found that it was not reasonable for [Lee] to believe that the Mazda's driver had intended to strike [Lee's] vehicle with his own. . . .

"Richie drove the Mazda on Auburn Boulevard across Interstate 80 and traveled along Auburn Boulevard, as it turned into Riverside. [Lee] followed in his vehicle. At the intersection of Riverside and [Cirby], Richie stopped for a red light. The Mazda was in the center lane of the road. The

lane to the left of the Mazda was a left turn lane and the lane to the right was another through-lane. [Lee] observed the Mazda stopped at the red light. [Lee] pulled around the right side of the car to the right of the Mazda and pulled into the intersection. [Lee] blocked the Mazda vehicle. . . .

"[Lee] exited his vehicle with his badge in his left hand but gun not yet drawn. As he approached the Mazda, [Lee] identified himself as a Sheriff's Officer and ordered the driver of the vehicle to halt. After a brief hesitation, Richie backed the Mazda several feet angling towards [Lee] and pulled forward nearly directly towards [Lee]. As the Mazda approached [Lee], Richie veered sharply left, went around [Lee] and his car, and down Riverside. . . .

"[Lee], believing the driver of the Mazda was attempting to run him down, drew his pistol; and, as the Mazda passed within 6 feet of [Lee], he jumped back and fired his weapon. Two shots were fired in rapid succession, although the second shot was inadvertent. The first shot struck the Mazda vehicle on the passenger's side just behind the front wheel-well about half-way up the body of the sports car. The second shot passed through the passenger's door at approximately the same height. Neither bullet struck either of the occupants in the Mazda. It was reasonable for [Lee] to believe that as the Mazda first started for him, it was the driver's intent to strike him. However, the angle of the first bullet fired and the distance between the muzzle of [Lee's] weapon and the sports car indicate that, at the time of the first shot, the sports car had veered away from [Lee] and was attempting to go around him. . . .

"[Lee's] wife was hysterical. He drove her home in Citrus Heights. [Lee] then left the house after instructing his wife to call the Roseville Police Department in whose jurisdiction the incident had taken place, identify her husband and tell them of the shooting. [Lee] and the friend who had been riding in the car drove to a Roseville hospital so [Lee] could see if anyone had come in or had been treated with a gunshot wound. [Lee] then proceeded to the Roseville Police Station. The station was locked. [Lee] was unable to raise anyone or to gain access to the station. He decided to go home and call from his home. . . .

"Upon arrival home, [Lee] learned that his wife had not called the Roseville Police Department. [Lee] called the Roseville Police Department, identified himself, and asked for a friend named Ed Roach. Someone at the Roseville Police Department told him that Ed Roach was not there. [Lee] hung up without mentioning the shooting. [Lee] then called the Sacramento Sheriff's Office and informed them of the incident.

"[Lee] called the Roseville Police Department again. This time [Lee] informed the department of the incident and thereafter went to the Roseville Police Station and arrived between 3:15 and 3:20 a.m. . . .

"At the time of the June 1, 1980, incident, [Lee] had been a Deputy Sheriff with the Sacramento Sheriff's Department approximately 1 year and 8 months. He had 12 years prior experience in law enforcement including employment in a law enforcement capacity with the U.S. Department of Defense. He had gone through the Sheriff's Office Academy and in June, 1980, was assigned to the Work Furlough Program. He had spent some time on patrol but had written only approximately 8 traffic tickets. He was an expert marksman. . . .

"[Lee] knew, at the time of the June 1, 1980, incident, that driving under the influence of alcoholic beverages was a misdemeanor offense as was reckless driving. One reason why [Lee] did not immediately pull off Interstate 80 to report the Mazda's apparent traffic violations was the absence of a license plate on the new car. . . .

"At the time of the June 1, 1980, incident, [Lee] knew the general orders relating to use of firearms and arrests by off-duty officers. With respect to off-duty misdemeanor traffic arrests, [Lee] knew that he was not supposed to make them. With respect to use of firearms, [Lee] did not remember the specifics of the general order dealing with that subject but did know that with respect to a felony, he was to remove his weapon but withhold fire until the felon attempted to harm him or another or attempted to flee. [Lee] knew of the specific section within the general order relating to the use of firearms which provides, 'An officer shall not fire at or from a vehicle unless there is reasonable assurance that such firing will not endanger innocent persons'. . . ."

I

In the mandamus proceeding initiated by the sheriff, the trial court exercised its independent judgment on the weight of the evidence. Lee contends the trial court should have limited itself to a determination of whether the Commission's penalty-reducing decision was supported by substantial evidence in light of the whole record. We agree.

In reviewing a local administrative decision pursuant to Code of Civil Procedure section 1094.5, the courts independently weigh the evi-

dence in a limited trial de novo only if the decision affects a fundamental vested right. In determining whether the right is fundamental, the court may weigh the economic aspect of it and its effect in human terms, which is to say its importance to the individual in the life situation. (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143, 144 [93 Cal.Rptr. 230, 481 P.2d 242]; *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 44 [112 Cal.Rptr. 805, 520 P.2d 29].) "[A] party has no standing to assert that an independent judgment review rather than a substantial evidence review is required unless *it* possesses a fundamental vested right *on its own behalf* which was involved in an administrative agency's action." (*Interstate Brands* v. *Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 781 [163 Cal.Rptr. 619, 608 P.2d 707], quoting *Sierra Club* v. *California Coastal Zone Conservation Com.* (1976) 58 Cal.App.3d 149, 155-156 [129 Cal.Rptr. 743]; italics in *Interstate Brands.*)

■ The sheriff asserts a fundamental vested right to choose which employees he retains or discharges (1) because his law enforcement responsibilities require that he employ deputies who are competent, follow orders, and exercise reasonable caution and judgment and (2) because he personally faces potential liability for the misfeasance of his deputies. These interests, however, are neither fundamental nor vested in the *Bixby* sense.

As stated in *Northern Inyo Hosp.* v. *Fair Emp. Practice Com.* (1974) 38 Cal.App.3d 14, 23 [112 Cal.Rptr. 872], and reiterated in *American National Ins. Co.* v. *Fair Employment & Housing Com.* (1982) 32 Cal.3d 603, 607 [186 Cal.Rptr. 345, 651 P.2d 1151]: ■ "While the right to pursue a lawful business or occupation is a fundamental right [citations], there is no vested right to conduct a business free of reasonable governmental rules and regulations [citations]." ■ Although the sheriff's department serves public rather than private interests, like other public agencies it is subject to civil service rules and regulations governing the employment and removal of its personnel. (See *Northern Inyo Hosp., supra,* at p. 23; Gov. Code, § 31100 et seq.)

■ "The term 'vested' denotes a right that is either 'already possessed' (*Bixby, supra,* 4 Cal.3d at p. 146) or 'legitimately acquired' (*Strumsky, supra,* 11 Cal.3d at p. 34)." (*Berlinghieri* v. *Department of Motor Vehicles* (1983) 33 Cal.3d 392, 396 [188 Cal.Rptr. 891, 657 P.2d 383].) ■ As opposed to economic burdens directly imposed by law (see *Interstate Brands* v. *Unemployment Ins. Appeals Bd., supra,* 26 Cal.3d at p. 781, fn. 7), the mere hypothetical possibility of civil liability for employee malfeasance does not give rise to a vested right to remove such employees.

In sum, the rights the sheriff identifies as being affected by the Commission's administrative decision are not immune from "extinction or abridgement by a body lacking *judicial* power." (Italics in original; see *Interstate Brands* v. *Unemployment Ins. Appeals Bd., supra,* 26 Cal.3d at p. 779, fn. 5.) Hence, the superior court erred in independently weighing the evidence before the Commission.[2]

II

As an alternate ground supporting issuance of the writ, the trial court reviewed the decision of the Commission under the substantial evidence standard. It concluded that although the Commission's findings were supported by substantial evidence in the administrative record, modification of the penalty of dismissal to suspension without pay was not supported by the findings.

■ When the substantial evidence test applies, the trial court exercises an essentially appellate function in determining whether the administrative record is free from legal error. On appeal, our scope of review is identical to that of the trial court. (*Bixby* v. *Pierno, supra,* 4 Cal.3d at p. 149; *City of Sacramento* v. *State of California* (1984) 156 Cal.App.3d 182, 190 [203 Cal.Rptr. 258].) Applying that standard, we find ample evidence in the administrative record to support the Commission's findings. We shall comment briefly on the only two factual findings contested by the sheriff in the trial court because they are particularly relevant to Lee's claim on appeal that the trial court erred in reinstating the penalty of dismissal.

■ The sheriff contended in the trial court that the evidence did not support the administrative finding that Lee did not have his gun already drawn when he got out of his car at Riverside and Cirby to confront the driver of the Mazda. We disagree. Lee, his wife, and the friend accompanying them each testified that Lee still had his gun tucked into his pants when he exited his vehicle and that he did not draw the gun until the Mazda started moving toward him. The only person who testified that Lee had already drawn his gun was the eyewitness Geneva Bench. Under the substantial evidence rule, reasonable doubts on conflicting evidence must be resolved in favor of the factual resolution by the Commission. (See *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12]; *Lorimore* v. *State Personnel*

---

[2]Given this conclusion, we need not address Lee's contention that the court improperly applied the independent judgment standard.

*Board* (1965) 232 Cal.App.2d 183, 186 [42 Cal.Rptr. 640].) ■ The sheriff also contended in the trial court that the evidence was insufficient to support the administrative finding that the second shot fired by Lee was inadvertent. Lee himself testified that the second shot was discharged just prior to falling to the ground and was "somewhat inadvertent." The criminalist's testimony that both shots were fired as the Mazda was moving in a direction away from Lee and his car does not render Lee's testimony incredible as a matter of law. The trial court properly rebuffed the sheriff's attack on these two findings of fact.

We part company with the trial court, however, on its conclusion that the Commission's factual findings failed to support the lesser penalty of suspension. ■ "The penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated." (*Barber* v. *State Personnel Bd.* (1976) 18 Cal.3d 395, 404 [134 Cal.Rptr. 206, 556 P.2d 306]; see also *Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 217 [124 Cal.Rptr. 14, 539 P.2d 774]; *Zink* v. *City of Sausalito* (1977) 70 Cal.App.3d 662, 665 [139 Cal.Rptr. 59].) "Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed." (*Barber, supra,* at p. 404.)

In considering whether an abuse occurred in the context of public employee discipline, an important consideration is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, harm to the public. (*Skelly* v. *State Personnel Bd., supra,* 15 Cal.3d at p. 218.) "Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Ibid.*) If reasonable minds may differ with regard to the appropriate disciplinary action, there is no abuse of discretion. (See *Lake* v. *Civil Service Commission* (1975) 47 Cal.App.3d 224, 228 [120 Cal.Rptr. 452].) ■ In light of Lee's long experience in law enforcement, the lack of any previous disciplinary action against him, and the unusual circumstances leading to his misconduct, a reasonable person could readily conclude that a suspension without pay rather than an outright dismissal was the appropriate penalty.

III*

. . . . . . . . . . . . . . . . . . . . .

*See footnote 1, *ante,* page 671.

## VI

The judgment is reversed with directions to the trial court to enter judgment denying the sheriff's writ petition. Appellant Lee is to recover his costs on appeal.

Regan, J., and Sims, J., concurred.