Opinion
 

 BRAUER, J.
 

 Percy Willis, a hospital services attendant at Valley Medical Center (VMC), a facility of Santa Clara County, was discharged from his employment on September 15, 1983. He appealed to the county’s personnel board (the Board), which (1) found that Willis had “failed to discharge his duties in a responsible manner, failed to maintain satisfactory and harmonious working relationships with patients and employees and engaged in gross misconduct”; but nevertheless (2) concluded “that the evidence does not support termination,” and ordered that “Percy Willis be reinstated without back pay.”
 

 Thereafter the County and VMC (hereinafter collectively designated as the County) applied for a writ of administrative mandamus, in accord with the provisions of Code of Civil Procedure section 1094.5, to set aside the Board’s reinstatement of Willis. After reviewing the administrative record, the superior court concluded “that the Personnel Board has abused its discretion by reinstating Respondent Percy Willis,” and issued a peremptory writ of mandate directing the Board “to vacate and set aside its decision reinstating Percy Willis and to uphold the termination of Percy Willis by Santa Clara County Medical Center [i.e., VMC].”
 
 [1]
 

 On appeal Willis argues that the writ was improperly issued because, as a matter of law, the court could not substitute its own discretion for that of the Board. Given the singular circumstances of this case, we disagree, and we therefore affirm.
 

 I. Evidence Presented to the Board
 

 A.
 
 The Hospital
 

 VMC has a special unit for the treatment and rehabilitation of patients who have suffered spinal cord injuries. The unit contains 30 beds. Four
 
 *1234
 
 beds are reserved for critically ill patients who arrive at the hospital immediately postinjury. Another four beds are reserved for “high quads,” i.e., patients whose injuries are high up on the spinal cord (the neck, for example) and who rely on some sort of external device to help them breathe. The remaining 22 beds are for patients who are engaged in therapy, learning to fend for themselves. Generally, the patients are fairly young, and have been involved in some sort of accident (motorcycle, automobile, diving, hang-gliding, free-fall parachuting, and the like).
 

 Because they are paralyzed, the patients need to be bathed and shaved, to be dressed and undressed, to have their hair combed and their teeth brushed, and to be assisted in and out of beds and wheelchairs.
 
 [2]
 
 They also need to be turned from time to time, to prevent pressure points and bedsores. For example, if a high quad patient (one with a spinal cord injury at the neck) is lying in bed, a “five man turn” is required—a doctor or nurse supports the patient’s neck, three people lift and turn the patient in unison, and a fifth person adjusts the bed and pillows. If a partially paralyzed patient is not turned properly, his paralysis may ascend his spinal cord, and he may become totally paralyzed.
 

 Patients in wheelchairs periodically need to be given a “weight shift,” to ease the pressure on their buttocks. As described by one witness, in a weight shift an attendant (1) stands in front of the patient’s wheelchair, and locks the brakes, (2) leans the patient forward so that the chest comes close to the knees, (3) supports the patient so that he, the patient, does not tumble forward onto the floor, and (4) leans the patient back in the wheelchair again. A weight shift can take several minutes.
 

 Since they have neither movement nor sensation in their lower extremities, the patients are prone to getting blood clots in their legs. A blood clot in the leg itself is not necessarily perilous, but if the clot breaks loose and travels (for example) to the lungs, “it can,” in the words of a registered nurse, “be life threatening.” Therefore the circumferences of patients’ legs are measured daily as a matter of routine. Any significant difference in leg measurement is supposed to be reported to a nurse or to a doctor immediately.
 

 The people who do all these things for the patients—bathing, shaving, dressing, turning, weight shifts and leg measurements—are the hospital services attendants, or HSAs. They work very closely with the nurses to provide basic needs for patients who physically are very dependent.
 

 
 *1235
 
 The patients are also psychologically vulnerable. Having suffered major injuries which rendered them helpless, they feel a profound sense of loss of control. They have a hard time adjusting to their new lives, and their emotions vary. As one witness put it: “There are all different kinds of expressions like depression, anger, some people withdraw, some people are real nasty, belligerent type of thing, other people are real quiet and withdrawn, some people like well, I’m paralyzed, but life is so wonderful, sometimes inappropriate; kind of runs the whole [gamut] of reaction.” The emotion most frequently exhibited is anger. One of the purposes of the rehabilitation program is to instill in the patients a sense that they have some control over their lives, and thus to temper adverse emotional reactions.
 

 The VMC spinal cord unit is a regional center, and so it is almost always full. In the morning hours the atmosphere of the unit is very hectic. All patients attending therapy sessions must be bathed, dressed, fed, put in wheelchairs, and be ready for therapy by about 9. Each attendant usually has four or five patients to take care of. An individual patient might feel sick and have to return to bed, or he might have an accident. Because of the tight time schedule, tempers are sometimes lost and sharp words are spoken. One attendant admitted that he had yelled at a paralyzed patient. In his words, “it’s not an everyday occurrence. It has happened.”
 

 B.
 
 Complaints About Willis
 

 Appellant Willis was employed as a hospital services attendant at VMC from 1979 until he was discharged on September 15, 1983. He testified on his own behalf, and candidly stated that he is a homosexual, and that while employed at VMC he never made any secret of that fact.
 

 Several witnesses—nurses, former patients, and an orderly—testified that Willis engaged in inappropriate behavior while working in the spinal cord unit. In general, they testified that Willis (1) made sexual advances to patients and to other employees, (2) demonstrated an insensitivity to or disregard of the needs of patients, and (3) failed to do his job properly. We summarize their testimony (and Willis’s response thereto) as follows:
 

 1.
 
 Sexual Advances
 

 (A) Former patient Terry Wade testified that Willis took an undue length of time in washing Wade’s genitals. In Wade’s words, “[c]ompared to somebody else, it would take somebody three minutes, five minutes at most,
 
 *1236
 
 washing up. Would take Percy ten, fifteen minutes.”
 
 [3]
 
 Wade also testified that when Willis assisted him in doing weight shifts, Willis would rub his own genitals against Wade’s head or shoulders “in a fashion that really wasn’t right, and nobody else would ever do it.” According to Wade, there were “numerous amounts” of other homosexual staff members at VMC, “and I got along with them fine, and their care was just as good as anybody else’s there.” But none of the other attendants stood so close to him during weight shifts. In response Willis testified that he took longer to wash Wade simply because Wade kept telling him to wait, that he didn’t want to be washed up just then. Willis conceded that during weight shifts he may have leaned against Wade, but insisted that this was sometimes necessary in order to support the patient.
 

 (B) An orderly named Levon Dermikaelian cited an instance in which he was sitting next to Willis at a table, and Willis reached between Dermikaelian’s legs and tried to grab his penis. Dermikaelian protested, and Willis giggled. In a later incident, at a nursing station and in full view of patients’ family members and visitors, Willis grabbed Dermikaelian’s buttocks with both his hands, “really hard.” Dermikaelian became very upset, and told Willis never to do that again. Willis did not take Dermikaelian seriously. Willis thereafter made soundless suggestive remarks, moving his lips and winking. Dermikaelian, a Lebanese Armenian, knew nothing about homosexuals before he came to the United States. For his part, Willis testified that “I don’t know what he is talking about.” He admitted that he had once “slapped him [Dermikaelian] on the ass; that’s what he did to me the first time around.”
 

 (C) Registered nurse Nestora Longoria testified that in turning a patient, Willis would frequently station himself “in the center part of the turn,” i.e., near the patient’s genital area. She said, “[A]n awfully [szc] lot of times I would notice he would pick up a towel and smooth it out in that genital area which is really uncalled for ... .” Willis denied purposefully taking the center position in turns, and said that if he picked up a towel, it was to cover the patient’s genital area because “I didn’t want it in my face if I was there.”
 

 (D) Hospital documents admitted in evidence alluded to several other incidents in which Willis made sexual advances to fellow employees and to patients.
 

 
 *1237
 
 2.
 
 Disregard of Patient’s Needs
 

 (A) Former patient Wayne Roberts testified that on one occasion Willis pulled his (Roberts’) undershorts and trousers up too high, causing him discomfort in his wheelchair. When Roberts asked Willis to make an adjustment, Willis replied that he didn’t have enough time. On another occasion, when Roberts was being washed up in the morning, he asked Willis to close the curtains around his bed because there were females outside who could see him. Willis refused to close the curtains. In another episode Roberts asked Willis to rinse some soap off; Willis responded that that particular kind of soap did not need to be rinsed off. Roberts got help from others. In yet another instance, Roberts asked Willis to shave him and brush his teeth, and Willis refused to do so. On his own behalf Willis testified (1) that the first incident occurred on a very busy day, and he told Roberts that he would make an adjustment when Roberts came back from therapy; (2) that he had “no idea” about the incident in which the curtains were not pulled; (3) that he did not recall the incident in which the soap was not rinsed off; and (4) that when Roberts asked to be shaved and to have his teeth brushed, Willis asked “someone else to do it for me because I didn’t have the time at the time.” Willis also testified that Roberts “was really a hard person to get along with,” because “[h]e wanted things done right then and there, and that was that.”
 

 (B) Registered nurse Ethel McCracken overheard a heated argument between Wayne Roberts and Willis. Roberts wanted his face washed; Willis responded that he was busy. In the end, McCracken washed Roberts’ face. According to McCracken, “[i]t was very inappropriate to have to get so upset over anything of such as small a nature as doing patient care; it was his [Willis’s] job.” McCracken also testified that “Percy had very set ways about what should be done and when it should be done and did not necessarily coincide with the needs of the patient.” “He [Willis] tended to have his own set ways, and as long as everybody fit into his set pattern it went pretty well, but the minute it went against his set pattern you ran into problems.” “It was something that happened over and over again. It was like I heard it just too many times, and I was going to run it down today.” Other attendants would have reacted differently. Willis himself testified that he did not recall this incident.
 

 (C) Nurse Longoria testified that on one occasion she sought the assistance of an attendant named Eddie, to help her in turning a patient. Eddie was in a room with Willis and two patients. Longoria asked if Eddie was busy. Willis yelled at her that “[y]es, he is busy; he is helping me, so you can’t have him, so you can’t take him away.” Willis followed Longoria out
 
 *1238
 
 into the hallway, using “foul” language.
 
 [4]
 
 Longoria “resented the fact that every time we asked Percy to help he would yell back.” “[A]fter a while you build to a boiling point. We have this confrontation time and time again.” “I had too many experiences where I would go to Percy for help and he would yell at me and say no I can’t do it, I’m busy; can’t you see I’m busy, that sort of thing.” On his own behalf, Willis testified that he vaguely remembered this incident, but “I’m not sure exactly about it.” He denied using any kind of foul language. According to Willis, Longoria “would get angry at anybody,” “[s]he was kind of a heated person that way.”
 

 (D) Hospital documents admitted in evidence referred to Willis’s “chronic tardiness.” On one occasion Willis was two hours and fifteen minutes late for work, and it was necessary to utilize another attendant to care for his patients. VMC was short of staff at the time, and this created a hardship.
 

 3.
 
 Failure to Do Job Properly
 

 (A) Registered nurse Margie Rummelman testified that on one occasion Willis was late in reporting a significant change in the circumference of a patient’s leg. Willis made his report after 2 p.m.; he had taken the leg measurement at around 8 a.m. Rummelman asked Willis why he had not reported the significant measurement earlier. According to Rummelman, Willis at that time replied that he couldn’t find her to report it. Rummelman did not believe him, “[b]ecause I was around all day, and it was significant enough that he should have reported it to somebody. If he was unable to find me he should have found another RN or the charge nurse and reported it immediately.” On the witness stand, Willis stuck to his previous story: “there was no one around at the time for me to get her attention to it.” He acknowledged that “when there was something that was serious, you really ran and got to it right away,” but he did not think that this particular leg measurement was serious.
 

 (B) On another occasion, a diabetic patient had an insulin reaction after the lunch period. Willis reported to Rummelman that the patient had eaten lunch. But the patient himself told Rummelman that he had not eaten lunch. According to Rummelman, “Percy had given me information that wasn’t right.”
 

 As a result of these episodes, Rummelman did not trust Willis. She felt that she could not rely upon Willis to provide her with accurate information.
 

 
 *1239
 
 C.
 
 Evidence on Behalf of Willis
 

 Willis further testified that he tried several times to transfer out of the spinal cord unit, but his supervisor refused to let him do so. In his words, “they had other departments, other areas in the hospital that I could have went to. She told me she couldn’t. She couldn’t let me go. She couldn’t afford to lose me.”
 

 In addition to his own testimony, Willis produced in evidence letters written by 10 coworkers who praised his ability and attitude.
 

 A hospital attendant named John Gutierrez testified that he worked with Willis in the spinal cord unit; that he never heard Willis get into loud arguments or use vulgar language; and that until the time of Willis’s termination, he never heard anything about Willis’s sexual advances. After Willis had been discharged, Gutierrez wrote a three-page letter to the head nurse, saying he felt that Willis had been “railroaded” out of his job. He never heard any rumors about Willis’s sexual activities on the ward. He agreed with Willis that Terry Wade and Wayne Roberts were both very difficult patients to deal with. Gutierrez testified that he had no idea why Willis was discharged; “[h]e was no different than other co-workers.”
 

 D.
 
 The Board’s Findings and Decision
 

 Based upon the foregoing evidence, the Board issued a written decision, which reads in pertinent part: “. . . the Board finds that Percy Willis failed to discharge his duties in a responsible manner, failed to maintain satisfactory and harmonious working relationships with patients and employees and engaged in gross misconduct. [1f] The Board further concludes that the evidence does not support termination and orders that Percy Willis be reinstated without back pay. The Board further recommends that Percy Willis be transferred from the spinal cord unit at Valley Medical Center.”
 

 E.
 
 The Superior Court’s Decision
 

 The peremptory writ of mandate reads in pertinent part: “Whereas, it appears to this court that the Personnel Board has abused its discretion by reinstating Respondent Percy Willis; [f] Therefore, the Santa Clara County Personnel Board is hereby commanded to vacate and set aside its decision reinstating Percy Willis and to uphold the termination of Percy Willis by Santa Clara County Medical Center.”
 

 n. Discussion
 

 On appeal Willis does not directly challenge the findings of fact made by the Board. But he devotes several pages in his briefs to an examination of
 
 *1240
 
 the evidence presented to the Board, apparently in an effort to demonstrate that there was “considerable and substantial evidence which supported reinstating Percy Willis.” He points out that “[t]he evidence presented to the Personnel Board was completely contradictory in nature,” and therefore the Board cannot be said to have abused its discretion in ordering his reinstatement. Accordingly, we begin by determining the appropriate standard of review.
 

 In its petition for writ of administrative mandamus the County sought to protect its right to discharge Willis. This right is neither a fundamental nor a vested right in the sense intended by the California Supreme Court in
 
 Bixby
 
 v.
 
 Piemo
 
 (1971) 4 Cal.3d 130, 141-147 [93 Cal.Rptr. 234, 481 P.2d 242]. (See
 
 Lowe
 
 v.
 
 Civil Service Com.
 
 (1985) 164 Cal.App.3d 667, 675 [210 Cal.Rptr. 673] [sheriff’s right to discharge deputy for improper use of firearm not a vested or fundamental right].) Therefore the trial court properly utilized the substantial evidence test in reviewing the Board’s findings.
 
 [5]
 
 Where an administrative decision is “properly reviewed in the superior court under the substantial evidence standard or an abuse of discretion standard, the scope of review is the same in the appellate court as it was in the superior court, that is, the appellate court reviews the administrative determination, not that of the superior court, by the same standard as was appropriate in the superior court.”
 
 (Schmitt
 
 v.
 
 City of Rialto
 
 (1985) 164 Cal.App.3d 494, 501 [210 Cal.Rptr. 788].)
 

 Guided by the foregoing principles, we conclude that the record (which we have summarized above) contains substantial evidence in support of each of the Board’s findings of fact.
 

 Nevertheless, “[t]he penalty imposed by an administrative body will not be disturbed in mandamus proceedings unless an abuse of discretion is demonstrated. [Citations.] Neither an appellate court nor a trial court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed. [Citation.]”
 
 (Barber
 
 v.
 
 State Personnel Bd.
 
 (1976) 18 Cal.3d 395, 404 [134 Cal.Rptr. 206, 556 P.2d 306];
 
 Skelly
 
 v.
 
 State Personnel Bd.
 
 (1975) 15 Cal.3d 194, 217 [124 Cal.Rptr. 14, 539 P.2d 774];
 
 Lowe
 
 v.
 
 Civil Service Com., supra,
 
 164 Cal.App.3d at p. 677.)
 
 *1241
 
 “In considering whether [an] abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee’s conduct resulted in, or if repeated is likely to result in, 1 [h]arm to the public service.’ [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence. [Citation.]”
 
 (Shelly
 
 v.
 
 State Personnel Bd., supra,
 
 15 Cal.3d at p. 218. “If reasonable minds may differ with regard to the appropriate disciplinary action, there is no abuse of discretion. [Citation.]”
 
 (Lowe
 
 v.
 
 Civil Service Com., supra,
 
 164 Cal.App.3d at p. 677.)
 

 However, “while the administrative body has a broad discretion in respect to the imposition of a penalty or discipline, ‘it does not have absolute and unlimited power. It is bound to exercise legal discretion, which is, in the circumstances, judicial discretion.’ [Citations.]”
 
 Skelly
 
 v.
 
 State Personnel Bd., supra,
 
 15 Cal.3d at pp. 217-218.)
 

 In the light of the principles just cited we conclude that the Board abused its discretion in reinstating Willis. First, Willis’s sexual advances toward patients and coworkers, as described in the record, plainly amounted to criminal battery.
 
 [6]
 
 (Pen. Code, § 242.) The point is not that Willis had homosexual preferences; the point is that he inflicted those preferences upon persons who could neither resist nor recoil. Nurse Longoria put it this way: “If they want to be gay that is their prerogative, but I don’t believe that someone should come into a hospital such as ours where there are patients who are paralyzed say from the waist down and are defenseless and cannot help themselves and be at the mercy of someone like that.”
 

 Second, the record reveals that Willis’s sexual horseplay in the hospital continued over a substantial period of time. As early as 1979 Willis was reprimanded for “persisting in asking other orderlies for dates when they have clearly indicated they are not interested,” and for “touching and hugging other orderlies, above done in the presence of patients causing embar
 
 *1242
 
 assment.” In 1982 he again was reprimanded for “sexual comments made to fellow employees which they report as offensive.” The incidents involving Terry Wade and Levon Dermikaelian both occurred in 1983. The hospital’s letter of termination, dated September 14, 1983, and introduced in evidence, mentions “ten (10) complaints from employees regarding sexual harassment and poor relationships and four (4) complaints from patients regarding sexual harassment and improper treatment.” The pattern plainly suggests that if Willis were continued in his employment caring for patients, similar incidents would be likely to recur.
 

 Third, Willis’s cavalier attitude was inappropriate in a hospital setting. Section 70707 of title 22 of the California Administrative Code provides that hospital patients are entitled to “[considerate and respectful care.”
 
 [7]
 
 Federal regulations provide that in hospitals which receive federal funds, “Each resident [i.e., patient] must be free from mental and physical abuse.” (42 C.F.R. § 442.311(f) (1985).) No doubt the patients in the spinal cord unit at VMC were more demanding than other patients; but they also were peculiarly vulnerable, both physically and emotionally, and to ignore their requests for assistance was grossly unprofessional. No doubt the atmosphere in the unit was at times hectic; but shouting at patients and the use of profanity surely did nothing to improve it.
 

 Fourth, the County faced potential civil liability for Willis’s misconduct. (See Gov. Code, § 815.2.) It is true that “the mere hypothetical possibility of civil liability for employee malfeasance does not give rise to a vested right to remove such employees.”
 
 (Lowe
 
 v.
 
 Civil Service Com., supra,
 
 164 Cal.App.3d at p. 675.) Nevertheless, since both the patients and the public at large are entitled to protection, it makes no sense to retain a hospital employee whose conduct repeatedly exposed the governmental entity to the prospect of litigation.
 

 Finally, we cannot conceive of any unit in the hospital, dealing with the care of patients, to which Willis could suitably have been transferred. Granted, Willis himself testified that there were “other areas in the hospital that I could have went to,” but he did not specify which “areas” he had in mind. The record does not disclose that Willis had any sort of special training which would qualify him for a position other than hospital services attendant. In the absence of evidence regarding another suitable and available position, retention of Willis as a hospital employee to care for patients is incomprehensible.
 
 [8]
 

 [1]
 

 Although the Board was named in the petition as a party respondent, it is not a party to this appeal.
 

 [2]
 

 Patients who have no hand function are, according to one defense witness, “really impaired. You have to do pretty much everything for them.”
 

 [3]
 

 While Willis was washing, Wade could not see what Willis was doing. Wade had no tactile sensation in his genital area. When Wade asked Willis what he was doing down there, “[h]e’d get upset, get testy with me.” According to Wade, “[t]he way I remember him taking so long is because he would be down there forever ... I don’t even know how to describe it, just I could feel that he was taking that much more time, especially when he would go off and come back and do the same thing and go off and come back . . . .”
 

 [4]
 

 Longoria quoted Willis as saying, “You’re God damn fucking right it’s uncalled for.”
 

 [5]
 

 The trial court made no findings of fact, other than to note that the Board had abused its discretion. “Where the only issue in a proceeding is whether the administrative decision is supported by substantial evidence in the light of the whole record or whether there has been an abuse of discretion, findings are not essential to effective appellate review of the decision of the trial court.”
 
 (Friends of Lake Arrowhead
 
 v.
 
 Board of Supervisors
 
 (1974) 38 Cal.App.3d 497, 518 [113 Cal.Rptr. 539].) In this appeal both sides have assumed that the trial court applied the substantial evidence test.
 

 [6]
 

 The least unprivileged touching may constitute a criminal battery. “‘“In other words,
 
 force
 
 against the person is enough, it need not be violent or severe, it need not cause bodily harm or even pain, and it need not leave any mark.””’
 
 (People
 
 v.
 
 Rocha
 
 (1971) 3 Cal.3d 893, 899, fn. 12 [92 Cal.Rptr. 172, 479 P.2d 372], quoting from 1 Witkin, Cal. Crimes (1963) § 258, pp. 243-244.)
 

 In 1984 (well after Willis had been discharged) the Legislature added subdivision (b) to Penal Code section 243.4. (Cal. Stats. 1984, ch. 1495, § 1.) That subdivision reads as follows: “Any person who touches an intimate part of another person who is institutionalized for medical treatment and who is seriously disabled or medically incapacitated, if the touching is against the will of the person touched, and if the touching is for the purpose of sexual arousal, gratification, or abuse, is guilty of sexual battery. Such act is punishable by either imprisonment in the county jail for not more than one year or in the state prison for two, three, or four years.”
 

 [7]
 

 The Statement of a Patient’s Bill of Rights, promulgated by the American Hospital Association in 1972, holds as its first tenet that “The patient has the right to considerate and respectful care.”
 
 (Miller
 
 v.
 
 Kennedy
 
 (1974) 11 Wn.App. 272 [522 P.2d 852, 866].)
 

 [8]
 

 Willis testified that he “tried to go to Second Central,” a unit devoted to the treatment of patients with head injuries. It is difficult to imagine that patients with head injuries would be any less vulnerable than patients with spinal cord injuries.