[No. B084318. Second Dist., Div. Two. Apr. 12, 1995.]

JAMES C. HANKLA, as City Manager, etc., Plaintiff and Appellant, v. LONG BEACH CIVIL SERVICE COMMISSION, Defendant and Respondent;
ALAN ICE, Real Party in Interest.

COUNSEL

Liebert, Cassidy & Frierson, Linda Jenson and Debra L. Bray for Plaintiff and Appellant.

Rourke, Woodruff & Spradlin, Daniel K. Spradlin, Thomas F. Nixon and M. Lois Bobak for Defendant and Respondent.

James E. Trott for Real Party in Interest.

## OPINION

**BOREN, P. J.**—Alan Ice, an off-duty Long Beach police officer, shot and nearly killed the driver of another vehicle following a heated verbal dispute over a trivial driving incident. The Long Beach Police Department terminated Ice's employment on the grounds that Ice unnecessarily engaged in a traffic dispute that ultimately required police response; unnecessarily armed himself; and acted either negligently or intentionally by shooting the other motorist.

Ice appealed his termination to the Long Beach Civil Service Commission. After sustaining all but one of the charges against Ice, the commission incongruously reinstated his employment. We conclude that the civil service commission abused its discretion by reinstating Ice as a peace officer.

### FACTS

On the morning of September 28, 1991, Neil Cramer was driving his camper down a street in the City of Fountain Valley. With him were his 11-year-old child, Autumn, and his girlfriend, Elaine Lara. Suddenly, a child riding a bicycle fell into Cramer's path. Cramer glanced briefly into his side mirror, then swerved into the adjoining traffic lane on the left to avoid striking the fallen child. He did not see a car in the left lane.

Moments later, Cramer heard honking behind him. Cramer and Autumn both saw respondent Alan Ice in a utility vehicle, giving them "the finger." Cramer gestured back in a like manner. Ice claimed that Cramer made the first obscene gesture but agreed that he reciprocated in kind. The two men stopped at a red light. Cramer pulled even with Ice and attempted to explain to Ice that he had swerved to avoid the fallen child. Ice concedes that Cramer made reference to the fallen child at the outset. Cramer asked Ice why he was so upset.

A heated and vulgar exchange ensued. Ice said, "You don't have to take up the whole fucking road, you faggot." Cramer replied, "Don't call me a faggot, you fat slob." Both men were angry. Ice was belligerent. Cramer said, "Fuck you," and Ice responded, "Fuck you too." While this seemed unlikely to defuse the situation, Ice hoped Cramer would "just ignore" his remarks. Ice "was trying to meet [Cramer's] level." He felt that uttering "Fuck you too" was an appropriate thing to say. He described himself as being angry.

Cramer was concerned for the safety of his passengers. He turned to Lara and directed her to look for something to use in the event that Ice got out of his vehicle and came over. Either Lara or Cramer turned and retrieved a hammer, which Cramer kept in the car for his work as a carpenter.

Seeing Cramer turn away from him, Ice thought Cramer might be reaching for a weapon. Ice was aware there was at least one person in the car with Cramer. In fact, Autumn testified that Lara tried to communicate with Ice regarding the child blocking the roadway. Ice reached for a gun, which he kept in a fanny pack on the seat next to him. He removed the safety, and held the gun in his hand. Ice's gun, a Walther PPK .380-caliber semiautomatic pistol, can be fired while either cocked or uncocked. It takes 12 to 13 pounds of pressure to fire the gun while uncocked, and only 4 to 5 pounds of pressure to fire it when it is cocked. The safety mechanism on the gun can be reengaged without any need to touch the trigger or hammer. Ice described the gun as having "a sensitive trigger."

Meanwhile, both men were goading and taunting each other. Ice said to Cramer, "Get out of your truck, come over here and find out" if Ice had a weapon. He elicited a similar response from Cramer. Both men said, "Why don't you come and see what I got" during their discourse. Ice could not see Cramer's hands, became frightened for his safety, and cocked the gun. The two vehicles were both the first cars in their lanes at the light, and Ice did not believe there were any cars behind him.

The stoplight turned green. Cramer spat at the passenger side of Ice's vehicle, then drove off. Ice saw both of Cramer's hands on the steering

wheel and realized that Cramer was not going to prolong or escalate the battle. He testified that Cramer pulled his head back into his vehicle, causing Ice to believe that Cramer "was trying to leave." Further, Ice testified, "[W]hen [Cramer] pulled back into the truck, I thought it was to leave, to get out of there, that this thing was going to be over with. I knew I could get away from him, and that was my intent."

Ice did not pause to uncock the gun or allow Cramer to drive away, after seeing that Cramer intended to end the argument and leave. Rather, Ice floored the accelerator of his vehicle. His seat, which had a loose bracket that Ice could not afford to fix, jerked as the car lurched forward, bringing his gun hand up. Simultaneously, Ice tried to engage the gun's safety mechanism, while his finger was on the trigger and the gun was pointed toward Cramer.

Ice pulled the trigger and the gun discharged. Autumn heard her father yell, "I've been shot." Blood spurted all over the door and dashboard of Cramer's vehicle. The bullet pierced Cramer's left shoulder and lodged in his chest, one inch from his heart, and one and a half inches from his aorta. It punctured a lung as it passed. Had the bullet not been deflected by a rib, it would have pierced his heart or aorta, and he would have died. Cramer eventually recovered from the wound, though the bullet remains in his chest.

Following the shooting, Ice drove away quickly, as if he were trying to get away, then turned around and headed back toward Cramer. Though he knew he was shot, because there was blood all over the car, Cramer tried to escape from Ice and looked for a police station rather than drive to the hospital for help. He was in fear of his life, and believed Ice was going to shoot all of them. He told his girlfriend and daughter to duck down. They were petrified, believing Ice was coming after them. Autumn was hysterical. Cramer tried taking evasive steps to lose Ice, or keep him behind. Finally, Cramer started to feel bad, and decided to head for the hospital. When they arrived, all three occupants jumped out of Cramer's car and ran inside the emergency room.

Had Ice ever identified himself as a police officer, Cramer testified, there would not have been a problem. Ice conceded that he never told Cramer he was a peace officer. Nor did Ice display his badge, which was in the fanny pack next to the gun. In fact, he did not even think about showing Cramer the badge. He never tried to say to Cramer "You know, I lost my temper back there" or "We're acting like fools" or "I'm a police officer, we should just quit doing this," or words to that effect.

Ice asserted that the shooting was unintentional. However, he intentionally pointed the gun at Cramer's vehicle door (Cramer was four to six feet away.)

because Ice felt Cramer was a threat, though not a great threat because he could see Cramer's hands on the steering wheel and Cramer was starting to drive away. Still, Ice said, "[U]ntil he got out of my sight, I wasn't going to move that gun any position than at my door where I could raise it up if I had to." After the shooting, Ice pulled to the side of the road and activated the safety mechanism on the gun. He denied driving away. The only reason he turned around and followed Cramer to the hospital was because he wanted to see what had happened.

A police department shooting instructor felt that Ice did not violate departmental policy or act negligently by cocking his weapon, based on the limited facts he knew. This witness was given a few documents to read just prior to testifying. He agreed that the trigger finger was to be kept outside the trigger guard until an officer was "actually prepared to fire."

The Long Beach Police Department's shooting review board investigates all shootings by its employees, including this one. It determined that Ice had violated police procedures and training. First, while removing the gun from the fanny pack and holster were within departmental policy, cocking the gun was not. By cocking the gun rather than leaving it in the uncocked (but still dischargeable) mode, Ice increased the likelihood of an unintentional discharge. Second, he pointed the gun at someone while it was cocked. Third, the gun should not have been cocked at all in light of the risk of lurching or unanticipated movement by the vehicle. This is particularly true since the gun did not have to be cocked to be effectual. Departmental policy is that an officer's "finger is placed alongside the barrel until the target is in position. Then you take your safety off and you place your finger on the trigger and discharge the weapon." The shooting review board concluded that the shooting amounted to gross negligence and misconduct, and violated departmental policy. The case was referred to internal affairs for administrative review.

Following additional investigation and review, the recommendation was made that Ice be terminated from his employment at the police department. The Long Beach police chief followed this recommendation. He "came to the conclusion that the weapon was handled and displayed in a careless fashion" amounting to negligence.

Ice was charged with (1) unnecessarily involving himself in a traffic incident which caused other police officers to have to respond; (2) unnecessarily arming himself during an argument over a traffic incident; (3) negligently discharging a weapon; and (4) intentionally and without justification discharging a firearm and causing a serious gunshot wound. In his dismissal

letter, appellant James Hankla, the city manager of Long Beach, in addition to listing the above charges, also noted that Ice had received a letter of reprimand on March 21, 1991, for failing to take appropriate action after being dispatched on a call, necessitating the dispatch of another unit.

Ice appealed his dismissal to respondent civil service commission. On May 19, 1993, the commission sustained the first three charges against Ice, finding that Ice unnecessarily involved himself in a traffic dispute which led to a police response, that he unnecessarily armed himself, and that he negligently discharged his gun and wounded Cramer. It dismissed the charge that Ice fired his gun intentionally. Despite having sustained all but one of the charges, the commission reduced Ice's penalty from dismissal to suspension without back pay.

Appellant Hankla filed a petition for a writ of mandate on August 16, 1993, attacking respondent civil service commission's unexplained reduction of the disciplinary measure imposed on Ice, and urging that the commission had abused its discretion. The petition was denied on February 25, 1994. Judgment was entered in favor of respondent on March 4, 1994.

## DISCUSSION

### 1.  *Standard of Review*

At the outset, we emphasize that the charges against Ice were *sustained* by the commission, save the charge that he shot Cramer intentionally. There is no appeal before us challenging the sufficiency of the evidence to support the first three charges. Thus, the only question presented is "whether the Commission's penalty-reducing decision was supported by substantial evidence in light of the whole record." (*Lowe* v. *Civil Service Com.* (1985) 164 Cal.App.3d 667, 674 [210 Cal.Rptr. 673].)

■ The purpose of the writ of mandamus procedure is not to rubber-stamp every administrative decision that is rendered. If that were the case, there would be no point in reviewing administrative decisions at all. Reversal is warranted when the administrative agency abuses its discretion, or exceeds the bounds of reason. While the agency has discretion to act, that discretion is not unfettered. (*Skelly* v. *State Personnel Bd.* (1975) 15 Cal.3d 194, 217-218 [124 Cal.Rptr. 14, 539 P.2d 774]; *County of Santa Clara* v. *Willis* (1986) 179 Cal.App.3d 1240, 1251 [225 Cal.Rptr. 244].)

An abuse of discretion occurs where, as here, the administrative decision manifests an indifference to public safety and welfare. "In considering

whether such abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[h]arm to the public service.' [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Skelly* v. *State Personnel Bd.*, *supra*, 15 Cal.3d at p. 218.) The public is entitled to protection from unprofessional employees whose conduct places people at risk of injury and the government at risk of incurring liability. (*County of Santa Clara* v. *Willis*, *supra*, 179 Cal.App.3d at p. 1252.)

## 2. Case Law

There is ample precedent for terminating the employment of law enforcement personnel who use their weaponry under dubious circumstances.

In *Thompson* v. *State Personnel Bd.* (1988) 201 Cal.App.3d 423 [247 Cal.Rptr. 210], an off-duty correctional officer was terminated when he pointed a gun during a verbal dispute with other patrons in a bar. The gun was loaded and the safety was off. The officer contended that he thought he was being attacked by a gang member. In upholding the dismissal, the Court of Appeal observed, "A correctional officer must be able to maintain self-control, particularly when armed with a deadly weapon." (201 Cal.App.3d at p. 430.) A similar loss of self-control occurred in *Gray* v. *State Personnel Bd.* (1985) 166 Cal.App.3d 1229 [213 Cal.Rptr. 5], where an off-duty correctional officer threatened one individual by simulating a gun, then broke into his former girlfriend's house while in possession of a firearm. Doubts about the officer's ability to remain calm under pressure and the misuse of his weapon were decisive factors in terminating his employment. It was noted that the officer acted without provocation and with little or no control of his emotions, which posed a threat to the public and could adversely affect his fellow officers in the life or death atmosphere of a prison. (166 Cal.App.3d at pp. 1231-1232.)

Questionable gun use was also an issue in *Schmitt* v. *City of Rialto* (1985) 164 Cal.App.3d 494 [210 Cal.Rptr. 788]. Schmitt loaded his weapon with blanks before a training session. During the session, he asked another officer if he was wearing a bulletproof vest, then pointed his revolver at the officer and pulled the trigger, firing a blank round. He was apparently trying to demonstrate the importance of using proper safety equipment. He was fired. The trial court ordered his reinstatement, but this was overturned by the appellate court, which cited the officer's poor judgment as posing a serious danger to the public or police personnel. (164 Cal.App.3d at pp. 502-504.)

By contrast, one case demonstrates why, in some instances, suspension is an appropriate punishment for an off-duty shooting by a police officer. In

*Lowe* v. *Civil Service Com.*, *supra*, 164 Cal.App.3d 667, the vehicle of an off-duty sheriff was nearly struck by a car that was being driven erratically. Believing the driver to be intoxicated, the officer pulled alongside, identified himself as a deputy sheriff, and asked the man to pull over. This was repeated. The other driver refused, and in fact veered toward the officer's car. The officer followed the car. When it stopped, he approached the vehicle with his sheriff's badge in his hand, but without drawing his gun. The other driver then attempted to run the officer down. The officer pulled his gun and fired when the car was six feet away from him. No one was injured. Under the circumstances, dismissal was found to be an excessive punishment.

Far less than pointing a gun at or shooting innocent civilians provides a ground for termination. For instance, an off-duty highway patrol officer who indiscreetly exposed himself naked in the window of his home within view of neighbors was terminated for bringing "embarrassment and discredit to the law enforcement agency he served." (*Anderson* v. *State Personnel Bd.* (1987) 194 Cal.App.3d 761, 772 [239 Cal.Rptr. 824].) A police officer was discharged for coming to the station intoxicated, using amphetamines while on duty, and improperly requesting the dismissal of a traffic charge so that he could go on a hunting trip. (*Zink* v. *City of Sausalito* (1977) 70 Cal.App.3d 662, 665 [139 Cal.Rptr. 59].) Finally, a police officer was discharged for failing to conduct an adequate felony investigation; giving false and misleading statements to another officer; failing to complete a report; submitting an inaccurate report; and possessing another officer's uniform. (*Marino* v. *City of Los Angeles* (1973) 34 Cal.App.3d 461, 463 [110 Cal.Rptr. 45].)

### 3. *Abuse of Discretion*

■ As one court has noted, police officers "are the guardians of the peace and security of the community, and the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties and are faithful to the trust reposed in them." (*Christal* v. *Police Commission* (1939) 33 Cal.App.2d 564, 567 [92 P.2d 416].) Far from living up to this ideal, Alan Ice conducted himself in a manner that betrayed public expectations for a peace officer's maturity, judgment and self-control.

First, as the commission found, Ice unnecessarily engaged in a traffic dispute which ultimately required a police response. Rather than reacting coolly and with good judgment to a trivial driving incident, Ice conducted a shouting, gesturing and cursing match with another motorist. Cramer swerved to avoid running over a fallen child. No one contends that Cramer's driving maneuver was unjustified. Ice concedes that Cramer initially alluded

to the fallen child when the two men stopped at the light. Not content to let the matter rest by either ignoring Cramer or suggesting that he drive safely, Ice used verbal profanity and offensive physical gestures to communicate his feelings about Cramer. Unsurprisingly, the dispute escalated. Escalated, in fact, to the point where both men armed themselves.

Second, rather than taking evasive action when he believed Cramer might be reaching for a weapon (by backing up, making a U-turn or driving through the red light, for example), Ice armed himself with a gun and pointed it in Cramer's direction. At no time did he try to defuse or clarify the situation by apologizing or identifying himself as a police officer. While it is within departmental policy for an off-duty officer who feels threatened to arm himself or herself, the commission obviously rejected the notion that Ice's response was reasonable under the facts presented here. By finding that Ice unnecessarily armed himself with a gun, the commission reasonably concluded that less drastic alternatives than pointing a loaded, cocked gun were available to Ice, but that he failed to avail himself of these alternatives.

Third, the commission unanimously found that Ice negligently discharged his weapon and wounded Cramer, a finding that is abundantly supported by the record. By his own admission, Ice saw both of Cramer's hands on the steering wheel—not holding a gun or any other weapon—and saw Cramer start to drive away. Any threat that Ice perceived was, at that point, removed. Nevertheless, instead of waiting a moment to safely secure his weapon and allow Cramer to drive away, Ice floored his accelerator while the gun was still cocked and pointed in Cramer's direction. Contrary to departmental policy, his finger engaged the trigger instead of staying outside the trigger guard, where it is supposed to remain until the officer is actually prepared to fire at a target. The shooting caused the occupants of Cramer's vehicle, including his young daughter, to become panicked and hysterical, believing that Ice was trying to kill them.

None of these three findings by the commission is challenged on appeal.

Assessing the import of Ice's conduct is where we part company with the commission. This much is undisputed: Ice *knew* the gun was cocked; he *knew* the gun had a sensitive trigger; he *knew* Cramer was leaving and that the dispute was over; he *knew* his vehicle had a documented surging problem during acceleration; he *knew* his seat bracket was loose and that the seat rocked; he *knew* his gun was pointed toward innocent citizens who had committed no crime. Knowing all of these things, Ice still made no effort to avert disaster. It hardly takes an expert to conclude that a reasonable person would not attempt to engage the safety on a hair trigger gun while the gun is

pointed at people and while simultaneously flooring the accelerator of a surging vehicle with a loose seat bracket.

In light of the infantile behavior of Officer Ice in engaging in an unjustified traffic dispute, his conduct in escalating rather than defusing the argument, and his patently reckless behavior in handling a deadly weapon, it is entirely understandable why the Long Beach Police Department decided that it did not want an individual with so little emotional self-control or good judgment risking the lives of the citizenry and his fellow police officers.

In sum, the commission's penalty-reducing decision was not supported by substantial evidence in light of the whole record. Forcing the police department to retain an officer who is unable to handle competently either his emotions or his gun poses too great a threat of harm to the public service to be countenanced.

## DISPOSITION

The judgment denying the petition for a writ of mandate is reversed. The trial court is directed to enter a new and different order granting the writ as prayed.

Fukuto, J., and Brandlin., J.,* concurred.

The petition of real party in interest for review by the Supreme Court was denied August 16, 1995.

---

*Judge of the Municipal Court for the South Bay Judicial District sitting under assignment by the Chairperson of the Judicial Council.