[No. B093127. Second Dist., Div. One. Apr. 30, 1996.]

ALBERT BARBER, Plaintiff and Appellant, v.
LONG BEACH CIVIL SERVICE COMMISSION et al., Defendants and
Respondents.

**COUNSEL**

James E. Trott and Larry J. Roberts for Plaintiff and Appellant.

John R. Calhoun, City Attorney, and Linda L. Daube, Deputy City Attorney, for Defendants and Respondents.

**OPINION**

**VOGEL (Miriam A.), J.**—In a context where the major underlying issue was one of credibility, Long Beach Police Officer Albert Barber was fired

and his termination was sustained by the Long Beach Civil Service Commission. Barber's petition for a writ of administrative mandate was then denied by the trial court based upon the erroneous view that, notwithstanding the trial court's obligation to exercise its independent judgment, it could not consider the issue of credibility. We reverse.

## FACTS

On August 7, 1992, Tricia McCabe collided with a parked car. Paramedics took McCabe to the Long Beach Community Hospital, where Barber went to interview her. After talking to McCabe, Barber concluded that she was under the influence of alcohol (she had watery eyes, a strong odor of alcohol on her breath, fast and slurred speech). Barber advised McCabe of the options available to determine her blood-alcohol level, and McCabe chose a blood test—but when a laboratory technician arrived to take a blood sample, McCabe decided she was "afraid of needles" and asked for a urine test instead. At about this time, McCabe twice went to the restroom.

When Barber asked an emergency room nurse for help in obtaining a urine sample, he realized the hospital did not have any police department specimen bottles (the ones used by the police contain the preservative sodium fluoride, those used for medical tests do not), so Barber left the hospital and went to the police station to retrieve some bottles. When he returned, he asked another emergency room nurse, Nancy Kazan, to escort McCabe into a restroom and to obtain a urine sample. According to Barber, he gave Kazan two specimen bottles, rubber-banded together, and he received two specimen bottles back from Kazan. Kazan's memory was not altogether clear (although she was an experienced nurse, she had never taken a urine sample for police purposes and apparently did not understand that her recollection of the details might be important). The most Kazan could say, when asked how many vials were used, was: "I *think* there were two sitting on the counter from what I can remember, but I *think* I only took one into the bathroom with me." When asked whether she was "just trying to recall," she answered: "*I don't know for sure*, but I have never, ever taken two containers into the restroom." (Italics added.) She was equally vague about the amount of urine provided by McCabe, estimating that it was "maybe an ounce worth of urine" or 30 cubic centimeters (which is about equal to 30 milliliters). According to Barber, Kazan returned two vials to him.

McCabe was arrested. Barber submitted two vials of urine to a City of Long Beach criminalist, one containing 30 milliliters of urine, the other 38 milliliters of urine, and subsequent tests showed McCabe's blood-alcohol

level was .20 percent. Based upon Barber's declaration, a magistrate determined there was probable cause for McCabe's arrest—but for reasons not explained at Barber's hearing or anywhere in the record, a determination was made not to pursue criminal charges against McCabe. Instead, in October and November, the Department of Motor Vehicles held a two-day hearing to determine whether McCabe's license should be revoked. After McCabe testified on the first day of that hearing, her attorney requested a continuance to subpoena the nurses who had been on duty at the hospital on the night of her arrest. When the hearing resumed, the hearing officer (Maro Sasaki) questioned the manner in which McCabe's urine had been collected and, based upon discrepancies in the testimony given by Barber, McCabe and the two nurses, questioned whether McCabe had actually provided the full amount of urine contained in the two vials and whether two vials had been used when the sample was taken.[1] Sasaki found that Barber's testimony was not truthful, and Sasaki reported Barber to the Long Beach Police Department's internal affairs unit.

Sasaki *did* believe everything else Barber said. Sasaki found that Barber *had* observed objective signs of intoxication when he saw McCabe (bloodshot and watery eyes, and an odor of alcohol) and that Barber *did have* reasonable cause to believe McCabe was driving under the influence of alcohol. Sasaki also found that McCabe "chose and completed the urine test" with results showing a .21 percent blood-alcohol level. Sasaki nevertheless concluded that McCabe was not lawfully arrested, was not driving under the influence of alcohol and that cause did not exist to suspend her license because, according to Sasaki, the requirements of title 17 of the California Code of Regulations were not met in obtaining the urine sample because "no second sample [was] collected because [McCabe] was unable to urinate."

Although there does not appear to be *any* requirement in title 17 or anywhere else for the collection of two samples, it seems (from testimony later given by Barber's sergeant) that standard practice for the Long Beach Police Department is to take one sample when the bladder is voided, which is not analyzed, and a second sample 20 minutes later, which is analyzed. (See Cal. Code Regs., tit. 17, § 1219.2 [which requires only that a sample be collected "no sooner than twenty minutes after first voiding the bladder"].) Since McCabe twice went to the restroom after she refused to take the blood test she had originally requested, and since at least 20 minutes elapsed while

---

[1] According to Sasaki's subsequent testimony at Barber's hearing before the Civil Service Commission, McCabe said she voided and gave a sample to Nurse Kazan, and then waited 20 or 30 minutes but could not urinate again. A second nurse (Margry Owens) testified to Sasaki that McCabe could not urinate and that she (the nurse) gave an empty vial to an officer. Barber told Sasaki that two vials had been collected.

Barber went to the station to get the correct vials, it would seem to follow that the sample taken conformed to the regulation, but Sasaki concluded it did not.[2]

Sasaki's question about Barber's truthfulness resulted in an investigation of Barber by the Long Beach Police Department which, in turn, resulted in Barber's dismissal on March 18, 1993, by way of a letter advising him that he was losing his job based upon the following charges:

"1. On August 8, 1992, you failed to ensure the reliability of criminal evidence (urine sample) in a driving under the influence case investigation.

"2. On August 8, 1992, you submitted an inaccurate Report of Property (failed to list name of person collecting urine sample, wrong date and time of collection) and Arrest Report (wrong date and time of arrest, failed to include urine test information) regarding the arrest of Tricia McCabe for driving under the influence.

"3. On August 8, 1992, you knowingly submitted an arrest report which contained false information that . . . McCabe refused to submit to a Standard Field Sobriety Test.

"4. On November 10, 1992 at the Department of Motor Vehicles Hearing Office in Long Beach, you gave false testimony, while under oath in a driver's license suspension hearing, when you testified you received two urine samples after the arrest of Tricia McCabe."

Barber appealed to the Civil Service Commission and hearings were held during July and August 1993. Two experts testified at the hearing, one for Barber and one for the Department—but *nothing* either of them said explains how, if Barber is not believed, he was able to obtain two vials of McCabe's urine. Steven Fritch, the Department's expert, testified that the amount of sodium fluoride found in each of the two vials submitted by Barber was what it was supposed to be and that the blood-alcohol content of the urine in both vials was the same (.20 percent). As a result, it was Fritch's opinion that it was "unlikely" that part of the urine sample from one vial could have been poured into the other one (because that would have affected the ratio of sodium fluoride to urine).

Hank Greenberg, Barber's expert, agreed and explained further: "If urine was collected in one jar and then parts of it placed in the second jar, there

---

[2] A standard text on defending drunk driving cases explains that, although the American Medical Association recommends two samples, "this is rarely done by law enforcement agencies in California . . . ." (Taylor, Cal. Drunk Driving Defense (1988) § 9:27, p. 149.)

would be a distinct or significant difference in the amount of fluoride in the two samples," which there was not. Greenberg also explained that the urine had not been poured back and forth because, had that occurred, the amount of sodium fluoride in the two vials would then have been identical, which it was not. Further, the amount of urine was not increased to fill two vials by the addition of water—if that had been done, it would mean the sample was diluted by more than half, in which event McCabe's blood-alcohol level would have actually been more than .40 percent, which was not very likely. Greenberg discounted altogether the idea that Barber could have obtained the second sample from another person because, to do so, he would have had to find someone with "the same consistency, chemical makeup in glucose, protein, creatinine, urobilin, color, turbidity, and blood-alcohol concentration."

Thus, the question was whether Barber's memory of two vials was correct or whether McCabe's self-serving testimony and Kazan's hazy recollection of only one vial were to be believed. Notwithstanding that all of the physical evidence supported Barber's testimony and could not be reconciled with Kazan's version, the Commission believed Kazan rather than Barber, upheld Barber's discharge, and issued findings which bear little or no relation to the original charges and are not supported by the evidence. When Barber then petitioned the superior court for a writ of administrative mandate, the trial court concluded that, notwithstanding its obligation to apply its independent judgment in reviewing the evidence, it could not consider credibility. Judgment was entered for the Commission, and Barber appeals.

## DISCUSSION

On this appeal, Barber contends the charges against him were improperly amended in the middle of the hearing,[3] the evidence does not support the Commission's findings,[4] the findings do not support his termination, and the entire procedure was faulty. Although it appears that at least some of these

[3]Barber was charged with *"knowingly"* submitting an arrest report containing *"false"* information. In the midst of the hearing, when it became apparent that the evidence would not support this charge, the prosecutor proposed an oral amendment to charge Barber with "gross negligence." Notwithstanding that Assistant City Attorney Robert Shannon advised the Commission that it was stepping on Barber's due process rights, the Commission found Barber "guilty" of gross negligence. Were we to reach the merits of this claim, we would probably find error. (*Smith* v. *State Bd. of Pharmacy* (1995) 37 Cal.App.4th 229 [43 Cal.Rptr.2d 532].)

[4]Among other things, the Commission found that the criminal proceedings against McCabe did not go forward because of Barber's negligence. Were we to reach the merits of this contention, we would have to say that we are unable to find *any* evidence in the record explaining why the criminal proceedings were dropped. Our conclusion would be the same

contentions are meritorious, we do not reach any of them at this stage because the trial court's failure to conduct the review it was required by law to conduct precludes meaningful review by us.

■ Where, as here, a case involves a police officer's vested property interest in his employment, the trial court is required to exercise its independent judgment. (*Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 44-45 [112 Cal.Rptr. 805, 520 P.2d 29]; *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 [93 Cal.Rptr. 234, 481 P.2d 242]; *David Kikkert & Associates, Inc.* v. *Shine* (1970) 6 Cal.App.3d 112, 115 [86 Cal.Rptr. 161].) Contrary to the Commission's assertion and the trial court's ruling, an exercise of independent judgment *does* permit (indeed, it requires) the trial court to reweigh the evidence by examining the credibility of witnesses. As we explained 20 years ago, in exercising its independent judgment "the trial court has the power and responsibility to weigh the evidence at the administrative hearing *and to make its own determination of the credibility of witnesses.*" (*Guymon* v. *Board of Accountancy* (1976) 55 Cal.App.3d 1010, 1016 [128 Cal.Rptr. 137], italics added.)

*Arenstein* v. *California State Bd. of Pharmacy* (1968) 265 Cal.App.2d 179, 188 [71 Cal.Rptr. 357],[5] on which the Commission relies, predates *Strumsky* v. *San Diego County Employees Retirement Assn., supra,* 11 Cal.3d 28, 44-45 by six years and has been rejected by numerous cases decided in the post-*Strumsky* era. (See e.g., *Pittsburgh Unified School Dist.* v. *Commission on Professional Competence* (1983) 146 Cal.App.3d 964, 977 [194 Cal.Rptr. 672]; *San Dieguito Union High School Dist.* v. *Commission on Professional Competence* (1985) 174 Cal.App.3d 1176, 1180 [220 Cal.Rptr. 351]; *Bassett Unified School Dist.* v. *Commission on Professional Competence* (1988) 201 Cal.App.3d 1444, 1451 [247 Cal.Rptr. 865]; *Cooper* v. *Kizer* (1991) 230 Cal.App.3d 1291, 1300 [281 Cal.Rptr. 421].)

The record in this case leaves no room for doubt about the trial court's error. As the court described its task, it was required "to decide if the weight of the evidence or the preponderance of the evidence supported what the Civil Service Commission did" and to reverse only "if the preponderance of the evidence doesn't support their findings." The court went on: *"I don't*

regarding the Commission's finding that Barber somehow "failed to adequately control and supervise" McCabe while she was at the hospital. We haven't a clue what it is that he did or didn't do in this regard.

[5]*Arenstein* held that "although the superior court reviews the administrative record to see where the weight of the evidence lies, the credibility of witnesses is for the determination of the [administrative agency]." (*Arenstein* v. *California State Bd. of Pharmacy, supra,* 265 Cal.App.2d at p. 188.)

*believe I have the ability to reweigh credibility.* And the reason for that— that's a standard appellant [*sic*] rule. The reason for that is that the appellate court, and that's the way we're sitting in these case[s], we have no opportunity to see the witnesses testify, to listen to the inflections in their voice[s], to see their noses grow, so to speak. *So we can't reweigh the evidence. We [do not] deal with whether we think the credibility is different than the tribunal did.* But we definitely have to decide if the preponderance of the evidence under the independent judgment test supports or doesn't support the lower finding." (Italics added.)

These statements are flatly wrong. As we explained in *Guymon,* "[b]y reason of the importance of rights generally affected by administrative adjudications subject to the independent judgment test of review, California fixes responsibility for factual determination at the trial court rather than the administrative agency tier of the pyramid as a matter of public policy." (*Guymon v. Board of Accountancy, supra,* 55 Cal.App.3d at p. 1015; see also *Hankla v. Long Beach Civil Service Com.* (1995) 34 Cal.App.4th 1216, 1222 [40 Cal.Rptr.2d 583] [the "purpose of the writ of mandamus procedure is not to rubber stamp every administrative decision that is rendered"]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 1995) § 8:127 et seq, pp. 8-44 to 8-45. [the theory is that abrogation of a fundamental vested right " 'is too important to the individual to relegate it to exclusive administrative extinction' "].)[6]

The trial court's mistake goes to the heart of this case and precludes our ability to reach the merits of the appeal. This is so because on appeal from a judgment in a case where the trial court is required to exercise its independent judgment, our review of the record is limited to a determination whether substantial evidence supports the trial court's conclusions and, in making that determination, we must resolve all conflicts and indulge all reasonable inferences in favor of the party who prevailed in the trial court. (*County of Alameda v. Board of Retirement* (1988) 46 Cal.3d 902, 910 [251

[6]Although the trial court's reference to a "preponderance of the evidence" degree of proof is not altogether wrong, neither is it altogether right. In this context, the trial court is supposed to decide whether "the weight of the evidence produced or which could not, in the exercise of reasonable diligence, have been produced before the administrative agency and any evidence which might have been improperly excluded" is sufficient to support the administrative findings. (*Bixby v. Pierno, supra,* 4 Cal.3d at p. 143, fn. 10.) Although it has been said that "weight of the evidence" is synonymous with "preponderance of the evidence" (*Chamberlain v. Ventura County Civil Service Com.* (1977) 69 Cal.App.3d 362, 368 [138 Cal.Rptr. 155]), the record suggests that the trial court's reference to "preponderance of the evidence" was part and parcel of its misconception of the scope of its review when exercising its independent judgment, and that it was confusing "preponderance of the evidence" with "substantial evidence, a common standard of review on appeal."

Cal.Rptr. 267, 760 P.2d 464]; *Bixby* v. *Pierno, supra,* 4 Cal.3d at p. 143, fn. 10; *Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53].) It follows that where the trial court has failed to perform its duty, we are unable to perform ours, and the matter must be remanded for a new trial. (*Guymon* v. *Board of Accountancy, supra,* 55 Cal.App.3d at p. 1016 [the factfinding function is that of the trial court].)

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to conduct a new trial on Barber's petition for a writ of mandate, and to decide the matter anew based upon the correct standard of review. Barber is awarded his costs of appeal.

Ortega, Acting P. J., and Masterson, J., concurred.

A petition for a rehearing was denied May 17, 1996, and respondents' petition for review by the Supreme Court was denied July 31, 1996.