Filed 2/11/14  Connor v. City/County of San Francisco CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| EVAN CONNOR,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>THE CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>    Defendants and Appellants. | A137504<br><br>(San Francisco City and County Super. Ct. No. CPF11511559) |

Appellants, the City and County of San Francisco and the San Francisco Fire Commission (Commission), appeal from the trial court's order granting respondent Evan Connor's petition for writ of administrative mandate.  The court found the weight of the evidence did not support the Commission's findings that Connor attacked a patient being transported in an ambulance.  We affirm, concluding the court did not misallocate the burden of proof and substantial evidence supports the court's findings.

PROCEDURAL BACKGROUND

A San Francisco Fire Department (Department) investigation into allegations respondent Connor committed misconduct on October 17, 2010, resulted in a report concluding Connor violated several Department rules, including Article 3909 (False Reports), Article 3917 (Violence), Article 3919 (Proper Behavior), and Article 3923 (Acts Detrimental to Welfare of the Department).  On December 16, 2010, the

1

Department Chief charged Connor with those rule violations and recommended to the Commission that Connor be terminated.

The Commission conducted three days of evidentiary hearings in May 2011. On May 31, the Commission found Connor guilty of all the claimed rule violations and imposed the penalty of termination. On June 29, the Commission approved written findings of fact.

Connor filed a Petition for Writ of Administrative Mandate and Complaint for Declaratory Relief in September 2011, and a first amended petition in October 2012. In December 2012, the trial court filed its Statement of Decision (Decision) concluding the Commission abused its discretion because the weight of the evidence did not support the Commission's findings. The court directed that the disciplinary termination be set aside and that the Commission's findings be vacated. This appeal followed.

FACTUAL BACKGROUND

*Pio's Arrest and Ambulance Transport*

On October 17, 2010, at about 8:22 a.m., San Francisco Police Officer Kate Joshua responded to a call about a man asleep in a doorway on Dolores Street. The man was later identified as Anthony Pio, who weighed about 200 pounds and appeared to be homeless and mentally ill. Joshua identified herself as a police officer and roused Pio. Pio grabbed Joshua's legs and pulled her to the ground. After a struggle, Joshua was able to pull out her pistol and regain control of the situation.

Officer Joseph Obidi arrived on scene shortly thereafter. When Obidi attempted to handcuff Pio, Pio grabbed the officer's leg and pulled him down. In his effort to subdue Pio, Obidi punched Pio on the left side of his face several times as hard as he could. Additional officers arrived and Pio was handcuffed. Joshua testified that Pio was by far the most violent resister she had encountered in her four years of patrol duty and that she was the most frightened she had ever been on the job during the incident.

At 8:34 a.m., Obidi called for an ambulance because Pio had a large lump on his forehead. The first paramedic to respond to the scene observed "a hematoma over the left eye and some redness around the left eye." Respondent emergency medical technician

2

(EMT) Connor arrived at the scene in an ambulance along with paramedic Dylan Hawhee.

Even after being placed in handcuffs, Pio continued screaming and "ranting and raving, most of [his statements] didn't make any sense." Connor's October 17, 2010 "Patient Care Report" (Report) states that, when asked what happened, Pio said something "along the lines of, 'this small female police officer had no business being a cop, so I taught her a lesson.' "

Pio was secured to a backboard and gurney, and loaded into the back of the ambulance. His wrists were handcuffed to the backboard and belts were placed across his chest, waist, and legs. Pio's head was secured to the backboard with a Velcro strap and tape across his forehead. He was secured to the gurney with seatbelts fastened across his chest and waist.

Hawhee agreed to Connor's request to ride in the back with Pio. Normally a police officer would have ridden in the back of the ambulance with Connor and Pio, but the ambulance departed to the hospital without an officer in back. An officer had spoken to Connor and agreed to ride in the back, but Hawhee closed the ambulance doors and drove away without the officer inside. Hawhee testified she did not believe an officer was supposed to be inside. A police car escorted the ambulance from behind.

The ambulance left the scene at 9:16 a.m. After the ambulance had gone only a block and a half, Connor yelled for Hawhee to stop the ambulance, saying "Pull over, pull over, his legs are out of the straps." An officer who was in the police car following the ambulance saw one of the ambulance doors fly open, and Connor yelled, "Get in here, get in here, I need help." Pio was out of his leg restraints and was "screaming and kicking and throwing himself around." Pio's face was bloody and his left eye was swollen shut.

Connor asked Hawhee to check Pio's airway, and Hawhee began to suction blood from Pio's mouth. Pio spit a mouthful of blood into Hawhee's face. The ambulance proceeded to the hospital and Hawhee checked herself in to have her face flushed.

3

According to Connor's hearing testimony, as soon as the ambulance started to pull away, Pio became agitated and began to free his head from the restraints. Connor leaned over to reattach the restraint; Pio cursed and spit at Connor. Connor also felt something behind him and he realized Pio had freed his legs. Connor was hit in the back with either a foot or knee. Still leaning over Pio, Connor put his arm down to prevent Pio's head or spit from hitting him, and Connor's forearm came into contact with Pio's nose. Pio's nose began to bleed profusely.[1]

According to Hawhee's hearing testimony, shortly after the ambulance drove away she heard "what sounded like somebody being smacked in the back of the ambulance." She looked into the rearview mirror and "saw EMT Connor standing over the patient with his arm in a striking motion several times." She heard about four hitting sounds. She also heard Connor say "something to the effect of 'do you like hitting . . . female officers, police officers.' "[2]

At the hospital, Hawhee signed off on Connor's Report, which stated Pio had "a hematoma to his left eye" at the scene of the arrest, Pio kicked Connor in the back, and Connor's elbow struck Pio as Pio attempted to free himself from his restraints.

At the hospital, Connor came to see Hawhee in the room where she was being treated for blood exposure. According to Hawhee's hearing testimony, she told Connor his behavior put her "in a really hard position and that he wasn't allowed to practice vigilantism out there." Connor responded by saying, "I can see how you would think I was slapping the patient around in the back, but I was scared back there and the patient had kicked me.' " Connor also said Pio was trying to get out of his head restraints and

---

[1] Connor gave essentially the same account to the Department investigator. Connor's Report gave largely the same account, although it stated Pio kicked Connor in the back and that Connor's right elbow made contact with Pio.

[2] A paramedic Captain who interviewed Pio on two occasions testified about Pio's account of the incident. Pio claimed he was beaten in the ambulance, but he failed to provide a coherent account of what occurred.

Pio's nose hit Connor's elbow. Hawhee also testified that Connor said he had learned he can't "practice vigilantism." In Connor's hearing testimony, he admitted Hawhee said "you hit that guy" and "you put me in a very awkward situation." He explained to Hawhee that she was mistaken—that he did not hit Pio and was not being a vigilante.

Hawhee testified that, after she left work on October 17, 2010, she talked the matter over with her wife and decided to "come forward with what happened." She called a captain in the Department and reported Connor had hit Pio. She prepared a report reflecting her account. The report did not assert that Connor made comments about Pio liking to hit female police officers, or that Connor admitted "vigilantism" to Hawhee.[3]

DISCUSSION

Appellants contend the trial court placed on the Commission the burden to show the weight of the evidence supported the Commission's finding Connor attacked Pio in the back of the ambulance. Appellants also contend, even if the trial court did not misallocate the burden, the court's findings are not supported by substantial evidence. Both contentions fail.

I. *The Independent Judgment Standard of Review*

Section 1094.5 of the Code of Civil Procedure[4] sets out the procedure for judicial review of final administrative determinations by petitions for writ of mandate. (*Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 810 (*Fukuda*).) Subdivision (c) of section 1094.5 provides: "Where it is claimed that the findings [of an administrative body] are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In

[3] We deny appellants' March 15, 2013 request for judicial notice of documents related to the San Francisco Department of Emergency Management proceedings regarding Connor's EMT certificate. Appellants have not shown it would be appropriate to consider the documents in this proceeding arising from the Commission's findings and discipline.

[4] All further undesignated section references are to the Code of Civil Procedure.

5

all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." In the present case, the parties agree that, because Connor has a vested property interest in his employment, the independent judgment standard applies. (See *Bixby v. Pierno* (1971) 4 Cal.3d 130, 144-147 (*Bixby*); *Candari v. Los Angeles Unified School Dist.* (2011) 193 Cal.App.4th 402, 407 (*Candari*); *Barber v. Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652, 658 (*Barber*).)

Under the independent judgment standard, the trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda*, *supra*, 20 Cal.4th at p. 817.) This presumption " 'has the effect of an admonition to the court.' [Citation.] In other words, the presumption provides the trial court with a starting point for review—but it is only a presumption, and may be overcome. Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the agency's findings." (*Id.* at p. 818.)[5]

The independent judgment standard of review reflects a policy determination regarding the appropriate allocation of ultimate responsibility for factual findings in cases affecting fundamental vested rights. (*Guymon v. Board of Accountancy* (1976) 55 Cal.App.3d 1010, 1015 (*Guymon*) ["By reason of the importance of rights generally affected by administrative adjudications subject to the independent judgment test of review, California fixes responsibility for factual determination at the trial court rather than the administrative agency tier of the pyramid as a matter of public policy."].) As the Supreme Court explained in *Bixby*, *supra*, 4 Cal.3d at page 144, if an individual has acquired a vested fundamental right, "the courts have held the loss of it is sufficiently

---

[5]  Citing *Neighbors of Cavitt Ranch v. County of Placer* (2003) 106 Cal.App.4th 1092, appellants assert the trial court was required to "resolve disputes in favor of the agency's decision." *Neighbors* is inapposite because it involved the substantial evidence standard of review rather than the independent judgment standard.

vital to the individual to compel a full and independent review.  The abrogation of the right is too important to the individual to relegate it to exclusive administrative extinction."  (See also *id.* at p. 143 ["[b]y carefully scrutinizing administrative decisions which substantially affect vested, fundamental rights, the courts of California have undertaken to protect such rights . . . from untoward intrusions by the massive apparatus of government," fn. omitted]; *Fukuda*, *supra*, 20 Cal.4th at pp. 816-817 & fn. 8; *Barber*, *supra*, 45 Cal.App.4th at p. 659.)

In particular, and highly relevant in the present appeal, "an exercise of independent judgment *does* permit (indeed, it requires) the trial court to reweigh the evidence by examining the credibility of witnesses."  (*Barber*, *supra*, 45 Cal.App.4th at p. 658; see also *Candari*, *supra*, 193 Cal.App.4th at p. 407 ["[t]he trial court was permitted to draw its own reasonable inferences from the evidence and make its own credibility determinations"]; *Pittsburg Unified School Dist. v. Commission on Professional Competence* (1983) 146 Cal.App.3d 964, 977 ["the superior court was not bound by the findings of the [c]ommission in exercising its independent judgment review," and "the court was free to make its own determination of the credibility of witnesses in the process"]; *Guymon*, *supra*, 55 Cal.App.3d at p. 1016 ["the trial court has the power and responsibility to weigh the evidence at the administrative hearing and to make its own determination of the credibility of witnesses"].)

"[O]n appeal from a judgment in a case where the trial court is required to exercise its independent judgment, our review of the record is limited to a determination whether substantial evidence supports the trial court's conclusions and, in making that determination, we must resolve all conflicts and indulge all reasonable inferences in favor of the party who prevailed in the trial court.  [Citations.]"  (*Barber*, *supra*, 45 Cal.App.4th at pp. 659-660; see also *Candari*, *supra*, 193 Cal.App.4th at pp. 407-408 ["[o]ur task is to review the record and determine whether the *trial court's* findings (not the administrative agency findings) are supported by substantial evidence"; " '[w]here the evidence supports more than one reasonable inference, we are not at liberty to substitute our deductions for those of the trial court' "].)

II. *The Trial Court Did Not Misallocate the Burden of Proof*

Appellants contend the trial court failed to impose the burden on Connor to prove the Commission's findings were *not* supported by the weight of evidence, as required under *Fukuda*, *supra*, 20 Cal.4th at page 817. Appellants acknowledge the trial court recited the proper independent judgment standard of review. Specifically, the trial court stated, "The court examines the administrative record for errors of law and reweighs the evidence in a limited trial de novo. [Citation.] The court must afford a strong presumption of correctness concerning the agency's findings and the party challenging the administrative decision bears the burden of convincing the court that the findings are contrary to the weight of the evidence. [Citations.]" Among other cases, the court cited *Fukuda*. However, appellants point to other language used by the trial court in finding that the Commission's findings are "not supported by the weight of the evidence." The following three statements are at issue: "[i]t is more plausible or at least equally plausible that [Pio's] eye injury was caused prior to [Pio] being placed into the ambulance;" "[i]t is more plausible or at least equally plausible that the blows inflicted by . . . Obidi caused the eye injury;" and "[i]t is more plausible or at least equally plausible that [Pio's] behavior became volatile and combative once the ambulance doors closed, and that[,] in attempting to restrain [Pio,] Connor's elbow made unintentional contact with [Pio's] face, causing his mouth and nose to bleed profusely."

Citing *Fukuda*, *supra*, 20 Cal.4th 805, appellants contend those statements show the trial court failed to presume the correctness of the Commission's findings and placed the burden on appellants to show the weight of the evidence supported the findings. In *Fukuda*, in considering a terminated police officer's petition for writ of administrative mandate, the superior court stated the defendant city " 'has the burden of proof to produce a preponderance of evidence in support of the findings.' " (*Id.* at p. 810, fn. omitted.) The Court of Appeal affirmed, concluding that no presumption of correctness applied to the agency's findings. (*Id.* at 817.) The Supreme Court reversed, holding the trial court must afford administrative findings a "strong presumption of correctness," and

8

the party contesting the findings "bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Ibid.*)

*Fukuda* is distinguishable because in that case the trial court expressly placed the burden of proof on the defendant, while in the present case the trial court expressly placed the burden of proof on Connor and acknowledged the Commission's findings were presumed correct. While appellants contend the trial court's language "at least equally plausible" demonstrates that the court in fact failed to accord a presumption of correctness to the Commission's findings, we conclude the use of that phrase only renders the decision *ambiguous* on the point. On the one hand, the use of the phrase suggests the court may have believed that the evidence was in equipoise and that it was required to reverse in that instance, which fails to take into account the presumption in favor of the Commission's findings. On the other hand, the court expressly acknowledged the presumption and burden as described in *Fukuda*, and the court's analysis makes it clear it found Connor's account more credible than Hawhee's account. For example, the court found Hawhee's testimony that Connor made a taunting comment to Pio about hitting female officers was "not credible" because she did not include that alleged comment in her October 17, 2010 report, even though she included other specific alleged statements by Connor. The court also stated "the weight of the evidence shows that Hawhee's conclusion about what she saw and heard in the back of the ambulance was mistaken." And, in contrast, the court characterized Connor's version of events as "clear and logical."

The ambiguity in the Decision is fatal to appellants' claim on appeal. "[A] judgment is presumed correct, all intendments and presumptions are indulged in its favor, and ambiguities are resolved in favor of affirmance. [Citations.]" (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 765-766, citing *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631.) Furthermore, "[i]t is a basic presumption indulged in by reviewing courts that the trial court is presumed to have known and applied the correct statutory and case law in the exercise of its official duties." (*People v. Mack* (1986) 178 Cal.App.3d 1026, 1032;

9

accord, *People v. Coddington* (2000) 23 Cal.4th 529, 644, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Accordingly, we presume the trial court accorded the Commission's findings a presumption of correctness and imposed the burden on Connor to prove the weight of the evidence did not support those findings.

In order to avoid this interpretation of the Decision, appellants were obligated to bring the ambiguity described above to the attention of the trial court. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1136; accord, *State Bar of California v. Statile* (2008) 168 Cal.App.4th 650, 673.) *Arceneaux* considered sections 632 and 634, which "set forth the means by which to avoid application of . . . inferences in favor of the judgment." (*Arceneaux*, at p. 1133.) Section 632 permits a party to request that the trial court "issue a statement of decision explaining the factual and legal basis for its decision," and section 634 states that omissions or ambiguities in statements of decision shall not be construed in favor of the prevailing party if the "omission or ambiguity was brought to the attention of the trial court." *Arceneaux* held that the "clear implication" of section 634 "is that if a party does not bring [omissions or ambiguities in the statement] to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient in these regards . . . ." (*Arceneaux*, at pp. 1133-1134.)[6] In the present case, because appellants did not bring the ambiguity in the Decision to the attention of the trial court, the presumption that the court applied the proper standard of review applies.[7]

---

[6] Because the Decision is ambiguous, appellants' citation to *United Services Auto. Assn. v. Dalrymple* (1991) 232 Cal.App.3d 182 is unavailing. *Dalrymple* concluded that "section 634 does not require that a party who fails to file opposition to a statement of decision be deemed to have waived objection to legal errors which appear on the face of the statement." (*Id.* at p. 186.) However, the *Dalrymple* court emphasized, "Here, there is no omission or ambiguity in the trial court's statement. It clearly expresses the legal conclusion that Dalrymple is entitled to her attorney's fees." (*Ibid.*) Neither do any of the other cases cited by appellant on this issue involve an ambiguous statement of decision.

[7] *Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 214 Cal.App.4th 426, cited by appellants for the first time at oral argument, is

III. *Substantial Evidence Supports the Trial Court's Findings*

Appellants contend the trial court's findings that Connor did not assault Pio are not supported by substantial evidence.[8]  We disagree.

In reviewing the record under the substantial evidence standard of review, we resolve all conflicts in favor of Connor and give Connor the benefit of every reasonable inference in support of trial court's findings.  (*San Diego Unified School Dist. v. Commission on Professional Competence* (2013) 214 Cal.App.4th 1120, 1141-1142 (*San Diego Unified*).)  If the evidence supports multiple reasonable inferences, we cannot substitute our inferences for those of the trial court.  (*Id.* at p. 1142.)  " 'Substantial evidence' is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  [Citation.]  It is sufficient ' "if any reasonable trier of fact could have considered it reasonable, credible and of solid value." ' [Citation.]" (*Ibid.*)  Appellants' bear a "heavy" burden under this standard of review.  (*Id.* at p. 1145.)

Appellants argue the evidence does not support the trial court's credibility determinations.  They argue Hawhee was credible even though she initially acquiesced in Connor's version of events, because she did not have a motive to lie, she risked her job by admitting she lied when she signed off on Connor's Report, and she risked incurring the wrath of other paramedics by reporting Connor's misconduct.  They also suggest

distinguishable.  There, the Court of Appeal reversed and remanded to the trial court for reconsideration of the appellant's petition for writ of mandate under the independent judgment standard of review.  The Court of Appeal concluded that, although the trial court recited the proper standard of review, the court's analysis raised a "serious question" as to whether it had actually erroneously applied the substantial evidence standard of review.  (*Id.* at p. 435.)  In the present case, although the trial court's order contains some contradictory language, creating an ambiguity, the court's analysis makes it clear it found the weight of the evidence supported Connor's account and was contrary to the Commission's findings.  Furthermore, *Alberda* did not address whether the appellant in that case brought the ambiguity in the statement of decision to the attention of the trial court, or the effect of an appellant's failure to do so.

[8]  Although appellants framed the argument with reference to the substantial evidence standard of review for the first time in their reply brief, the argument is subsumed within their argument in the opening brief that the evidence was insufficient to support the trial court's decision as a matter of law.

Hawhee did not actually lie when she signed off on Connor's Report, because, under Connor's description of their confrontation at the hospital, Connor temporarily convinced her his version of events was true. That is, Connor admitted that, at the hospital, Hawhee said he had put her in a "very awkward situation" by hitting Pio. According to Connor, he told Hawhee he did not hit Pio and explained that Pio had spit at and kicked him. Hawhee responded, "Oh, I had no idea that that happened."

Although appellants' arguments regarding Hawhee's credibility are reasonable, the trial court was not required to accept those arguments. The claim that Hawhee's action in signing off on Connor's Report simply reflected her temporary acceptance of his version of events is only one possible inference. Another reasonable inference is that if Hawhee was convinced she had actually seen and heard what she later claimed to have seen and heard, she could not have honestly signed off on Connor's Report regardless of any assertions made by Connor at the hospital. Moreover, Hawhee's credibility was undermined by the fact she omitted from her October 17, 2010 report that she had heard Connor taunt Pio about hitting female police officers. That significant allegation provided a possible motive for the alleged attack by suggesting Connor hit Pio because Pio had attacked a female officer and Connor's fiancée was a police officer. Furthermore, because Hawhee was driving the ambulance at the time of the alleged attack, she did not have a clear view of the incident. Although she claimed to have seen Connor's arm moving up and down in a striking motion and to have heard hitting sounds, she did not actually see Connor hit Pio. In sum, there were bases to question the credibility and accuracy of Hawhee's account.

On the other hand, the trial court found credible Connor's account that Pio was injured while trying to escape his restraints. The court cited testimony from Joshua that Pio was "by far" the "most violent resister" she had encountered. The evidence showed Pio was strong, aggressive, and delusional. The officers following the ambulance testified that, when they came to Connor's aid after the ambulance stopped, Pio had managed to free at least his legs from the restraints and was violently kicking and screaming. Hawhee admitted Connor yelled, "Pull over, pull over, his legs are out of the

12

straps." The trial court also found that Connor's alleged motive—a desire for revenge inspired by the circumstance that his fiancée was a police officer—"makes no sense and is not supported by the record." The court reasoned: "No one reported that [Connor] appeared angry or upset at all when he was dealing with the patient and interacting with the other Fire Department and police personnel at the scene. . . . [Connor] did not know Hawhee and had only worked with her on one occasion before. . . . [Connor] had no reason to believe that Hawhee would cover for him if he acted unprofessionally or engaged in a criminal assault. There was no window and no wall separating the driver's compartment where Hawhee sat and the back of the ambulance. . . . There were two police officers in a car following directly behind the ambulance. It was broad daylight. It simply makes no sense for [Connor] to have started beating on the patient the moment the ambulance pulled away. [¶] Moreover, an attack like this is completely incompatible with anything in [Connor's] past. Several witnesses came forward to testify that [Connor] was an exceptionally good and professional EMT with an unblemished record. . . ." We also note there was evidence Connor agreed to have an officer ride in the back and Hawhee was responsible for the departure of the ambulance without an officer inside, which suggests Connor did not plan to attack Pio in the ambulance.

Appellants do not directly dispute the considerations emphasized by the trial court in concluding that Connor's account was credible, but they present other arguments why Connor's account of the incident was *not* credible. At the outset, they emphasize various aspects of his account that they suggest are implausible, including: That Pio could have escaped his leg restraints in seconds; that Pio could have kicked Connor in the back as Connor adjusted Pio's head restraints; that Pio freed his head from its restraints; that Pio's nose could have been broken by unintentional contact with Connor's forearm; and that Connor's shirt and arm would have been free of blood under Connor's account of the incident. Appellants' argument is based on inferences from the evidence and fact-based assessments of plausibility; none of the circumstances identified by appellants required the trial court to conclude Connor's account was so unlikely that it must be fictitious.

13

The one circumstance requiring closer scrutiny is appellants' claim that if Obidi had caused Pio's swollen eye, the eye would have been swollen before Pio was placed in the ambulance. The trial court relied on the evidence that, prior to Connor arriving on scene, Obidi punched Pio on the left side of his face several times as hard as he could. The court further relied on testimony that Pio had some injury to his left eye before departing in the ambulance. The first paramedic at the arrest scene testified he noticed "some redness around the left eye." A police officer testified Pio had "the beginning of a black eye, like it looked like . . . something had hit his left eye." Connor testified he observed "redness and swelling" to Pio's left eye before he went into the ambulance. Based on that evidence, the trial court concluded, "The mere existence of a more swollen black eye when the ambulance stopped than when the patient was initially observed at the scene . . . does not establish that the increased swelling and bruising was a result of later-inflicted multiple fist blows by" Connor.

Appellants emphasize expert testimony from emergency physician Dr. Karl Sporer, who testified that, based on reviewing a photograph of Pio's injury, "it would take some considerable blunt force to create this sort of injury." Furthermore, he testified that "something of this significance usually happens pretty quickly"; "I think this severity of injury you would have something visible pretty quickly, almost immediately" after an impact. Appellants argue Sporer's testimony shows the eye injury Pio displayed after being in the ambulance could not have resulted from Obidi's blows. However, appellants disregard the evidence that, in Sporer's language, there was "something visible" before Pio was loaded into the ambulance. Moreover, Sporer's testimony was brief, undetailed, and based solely upon his review of photographic evidence. Ultimately, although Sporer's testimony was more supportive of appellants' theory, it was not entirely inconsistent with Connor's theory. In any event, Sporer's testimony was not so conclusive as to obligate the trial court to conclude the eye injury happened in the ambulance.

Another of appellants' principal contentions is that the trial court "relied entirely on a version of events that Connor himself abandoned in the face of Commission

14

scrutiny." Appellants' assertion is based on a portion of Connor's testimony during which the President of the Commission asked Connor about his claim Pio kicked him in the back. Connor was asked, "And do you know how the patient was able to get out of his straps that were over his feet to kick you, or was he still strapped down?" Connor explained, apparently for the first time, that he had cut open Pio's jeans at the knees during a physical exam and, "when I exposed those, perhaps some of the belts could have been loosened unintentionally or they just weren't that tight to begin with. That's the only way that I could surmise that he was able to get his legs out of those belts." In response to a follow-up question regarding how Pio could kick Connor in the back, Connor explained he was leaning over Pio's body "and that's when I felt something hit me from here, and it could have been his knee or his foot. I'm not sure. But I wasn't looking that way, I was looking more towards his head to keep it secure."

Appellants' assertion that this portion of Connor's testimony constitutes an abandonment of his prior account is unconvincing. Contrary to appellants' assertions, Connor did not state that he was standing at the foot of the gurney when Pio's nose was injured or that he intentionally loosened the leg restraints. Connor did not state *when* he checked Pio's knees. Connor testified he did so during a "physical exam" in the back of the ambulance. Hawhee testified that Connor checked Pio "for any secondary trauma that we might have missed on scene" before the ambulance departed, so Connor could have examined Pio's knees then. The cited portion of testimony is certainly not an express abandonment of his prior account. To the extent the passage can be read to undermine Connor's testimony, that is an inference, and we owe deference to the trial court's reasonable inference to the contrary.

Finally, it is worth noting the Commission did not support its findings of fact, and the implied determination that Hawhee was more credible, with any observations of her or Connor's demeanor. In *San Diego Unified*, *supra*, 214 Cal.App.4th at page 1147, the court recited the proposition that, " ' "Even though the presiding officer's determination is based substantially on credibility of a witness, the determination is entitled to great weight only to the extent the determination derives from the presiding officer's

15

observation of the demeanor, manner, or attitude of the witness." ' [Citations.]" In that case, a school district terminated a teacher on the ground he inappropriately touched a student, but the Commission on Professional Competence determined the district had not proven the termination was justified. (*Id.* at p. 1123.) The district filed a petition for writ of mandate and the superior court granted the petition and vacated the administrative decision under the independent judgment standard of review. (*Id.* at pp. 1123, 1140.) The Court of Appeal reversed, concluding the superior court had failed to afford a strong presumption of correctness to the administrative decision, including the credibility determinations therein. (*Id.* at pp. 1123-1124, 1145-1147.) The Court of Appeal emphasized the decision *had* supported the credibility determinations with specific observations regarding the demeanor of the critical witnesses. (*Id.* at pp. 1147-1148.) Because the superior court was "silent as to the Commission [on Professional Competence]'s thoughtful reasoning and analysis as to the witnesses' credibility," the superior court failed to "afford the respect due those findings." (*Id.* at p. 1148.) In the present case, appellants cite to no reasoned credibility determinations that were disregarded by the trial court. We need not and do not conclude that the absence of the types of credibility observations present in *San Diego Unified* means the credibility determinations of the Commission are not entitled to great weight. But if the Commission had included such observations in its findings, then the trial court would have been obligated to consider them in making its own credibility determinations.

We conclude substantial evidence supports the trial court's findings that the weight of the evidence does not support the Commission's findings.[9]

---

[9] For the first time in their reply brief, appellants contend this court should direct the trial court to remand the matter to the Commission for a determination of whether Connor's alleged failure to provide patient care and to cooperate in the Department's investigation "independently support[] termination." However, contentions presented for the first time in a reply brief are forfeited. (*Loranger v. Jones* (2010) 184 Cal.App.4th 847, 858, fn. 9; *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.) Moreover, contrary to appellants' assertions, the Commission did not make any express findings that Connor failed to provide patient care (other than by attacking Pio)

DISPOSITION

The trial court's order is affirmed.  Costs on appeal are awarded to respondent Connor.

---

or that Connor failed to cooperate in the Department's investigation (other than by denying he attacked Pio).

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

NEEDHAM, J.