Filed 3/25/16  Richardson v. City of Los Angeles CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MICHAEL RICHARDSON, | B258654 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS144098) |
| v. | |
| CITY OF LOS ANGELES et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Joanne B. O'Donnell, Judge.  Affirmed.

Silver, Hadden, Silver & Levine, Susan Silver and Jacob A. Kalinski for Plaintiff and Appellant.

Michael N. Feuer, City Attorney, Amy Jo Field, Assistant City Attorney, and Juliann Anderson, Deputy City Attorney, for Defendants and Respondents.

_____

Plaintiff Michael Richardson appeals from the denial of his petition for peremptory writ of mandate, by which he sought to reverse the action of the Los Angeles Police Department (LAPD) reducing his paygrade and transferring him to a different division. He contends the penalty was excessive and procedural errors by the LAPD require reversal. We disagree and affirm.

## BACKGROUND

In 2008 the LAPD promoted Richardson to the Sergeant II paygrade. In 2011, the LAPD reduced Richardson to a Sergeant I paygrade and transferred him from Newton station to Southwest station. Richardson filed an administrative appeal. The hearing officer recommended upholding the paygrade reduction and transfer, and the chief of police adopted that recommendation. Richardson filed a petition for peremptory writ of mandate in the trial court. After a hearing, the trial court denied the petition, and Richardson filed the instant appeal.

### 1. The basis for the downgrade and transfer

The facts leading to the paygrade reduction and transfer are undisputed. In April of 2011,[1] a locker audit was carried out on the order of Richardson's commanding officer, Captain Robert Lopez. At the beginning of May, Lopez directed Sergeant Robert Von Voigt to place a notice on each locker that remained unclaimed. The notice warned that the lock would be cut from each locker that had not been claimed by June 3 and the contents of the locker would be removed.

Richardson created the following responsive notice (Occupied Locker notice), which he posted on his locker and e-mailed to Von Voigt and Officer Stuart Jaye on May 6: "OCCUPIED LOCKER NOTIFICATION  Please be advised that I have been assigned this locker since arriving in Newton in August of 2008. The locker was assigned to me by SERGEANT WEHAGE, and duly recorded as assigned to, and occupied by me. Since August of 2008, I have participated in no fewer than three locker audits in which I indicated that this is my locker. [¶] If you cut MY LOCK, off of this

---

[1] Undesignated date references pertain to 2011.

2

locker, I will complete an <u>IR for vandalism</u>.  If you remove <u>MY PROPERTY</u> from this locker, I will complete an <u>IR for GRAND THEFT</u> – FIREARM, and <u>file a suit for violation of civil rights relating to unlawful search and seizure</u>, as you **cannot** search or seize any work space without warrant or proper notification.  Failure to maintain adequate records on your part does **<u>not</u>** amount to the exigent circumstances required to allow you to seize my private property.  [¶]  IF I am close enough to retirement, or just having a bad day, I will forego the above in favor of a general beat-down, or ass-whipping.  [¶]  Thank you for your continued support [¶] – Mike Richardson"

Von Voigt showed Lopez Richardson's e-mail.  Lopez then examined and photographed Richardson's locker, upon which were taped 14 copies of Von Voigt's unclaimed locker notice.  The threat in Richardson's Occupied Locker notice made Von Voigt and Jaye uncomfortable.  Von Voigt was also concerned that Richardson was contradicting Von Voigt's directions for the locker audit.

Lieutenant Lightfoot sent out an e-mail directing all sergeants to comply with the locker audit request.  When Richardson inquired, Lightfoot told him the e-mail was directed at him as a result of his Occupied Locker notice.  Thereafter, a subordinate officer asked Richardson about all the notices, and he showed her his Occupied Locker notice.  Lopez spoke to Richardson about his Occupied Locker notice.  Richardson was remorseful and said it had been a practical joke that had been taken too far.

**2.**        **Procedures employed in making the downgrade and transfer**

After seeking advice and consulting with the Employee Relations Group and the assistant chief, Lopez decided to follow a recommendation to provide Richardson with a notice to correct deficiencies and downgrade and transfer him.  Lopez explained at the administrative appeal hearing that Richardson was assigned as an assistant watch commander and was therefore part of the divisional management.  His duties included carrying out and adhering to the directions of command staff and the LAPD and serving as a positive example to subordinate officers.  An assistant watch commander is looked upon as a leader and a "conduit of . . . command," and his or her failure to support the

directions of command undermines the command and can cause subordinates to question who is in charge. Lopez deemed Richardson's Occupied Locker notice as a challenge to Lopez's authority and disregard of a lawful order, in violation of LAPD's manual, volume 1, section 210.30.[2] Lopez explained: "When you have a leader who is a peer leader, and a strong peer leader, who alters or changes the thought process of those individuals who he's responsible for to motivate and train and guide, it's a concern to the Department and a concern to the command. . . . [I]t causes a divide within the command. It causes a challenge to authority. . . . [T]hey don't know who's in charge . . . the Sergeant II or the captain. [¶] . . . [¶] . . . [W]hen you have a challenge to authority and a disregard for lawful orders or commands or directives, it's a big concern."

Richardson's actions also caused Lopez to lose trust in Richardson's "ability to make the right decisions." Lopez wondered whether Richardson would refuse to carry out other directives and requests Lopez made and what decisions Richardson would make when left in charge without a lieutenant on duty.

Lopez chose a downgrade and transfer over a personnel complaint in order to "move the process through" more expeditiously and thereby reduce the divisive effect upon the division and any negative effect upon morale. He further explained: "I didn't have the confidence and the trust that allowing him to remain or allowing him to remain as a Sergeant II as an assistant watch commander would only empower Sergeant Richardson to continue his—that type of an attitude, that cavalier, or . . . arrogance . . . that if I didn't do the downgrade that it would only continue to empower him to challenge those simple requests." Lopez also considered Richardson's prior work history,

---

[2] LAPD manual, volume 1, section 210.30 provides: "The Department is an organization with a clearly defined hierarchy of authority. This is necessary because unquestioned obedience of a superior's lawful command is essential for the safe and prompt performance of law enforcement operations. The most desirable means of obtaining compliance are recognition and reward of proper performance and the positive encouragement of a willingness to serve. However, negative discipline may be necessary where there is a willful disregard of lawful orders, commands, or directives."

including things Lopez had praised him for and his status as "a very knowledgeable supervisor."

As soon as Lopez decided upon a course of action, he notified Richardson, removed Richardson as an assistant watch commander, and reassigned him to other duties. On May 19 Lopez prepared "Intradepartmental Correspondence" requesting that Richardson be downgraded and transferred and explaining the basis for the request, i.e., posting the Occupied Locker notice and subsequently displaying it to a subordinate after being notified by the watch commander to comply with the locker audit request. Richardson was served with the Intradepartmental Correspondence on May 20. Lopez also filled out a Transfer and/or Change in Paygrade form 1.40.00. Lopez's Intradepartmental Correspondence was ultimately approved and signed by the Commanding Officer of Operations—Central Bureau and the Director of the Office of Administrative Services, Assistant Chief Sandy Jo MacArthur.

Lopez also filled out a Notice to Correct Deficiencies form dated May 16, but signed May 19, setting forth the facts regarding the Occupied Locker notice and admonishing: "As a member of the Newton Area management team, this type of demeanor is not what is expected of a senior supervisor whose responsibility is to guide, train, direct, and motivate those over whom you have control of. Your unwillingness to comply and direct subordinates to comply with a lawful management request shows a total disregard for the duties and responsibilities that you have been entrusted to carry out as a supervisor for this Department." The notice continued: "This Notice to Correct Deficiencies is to advise you that this type of behavior will not be tolerated. As the Assistant Watch Commander and supervisor, it is your duty, responsibility and moral obligation to ensure that the directives mandated by the Department or Division Commanding Officers are instituted and followed. Any deviations to those directives or any comments that are perceived to be contrary, critical or negative is detrimental, undermines the command makes you ineffective as a leader and perpetuates a cynical work environment. [¶] As a member of this Department, you are directed to comply

5

with Departmental requests and support the goals and mission of the Department, supervisors and your Commanding Officers. Should you behave in the same or a similar way again, the Commanding Officer will recommend at least one of the following things to occur: [¶] You will be suspended without pay for a period of not less than 5 days; and you will be demoted." The form also included the following statement: "The purpose of this notice is to call your attention to the above-mentioned deficiencies and to provide you the opportunity to correct them." Richardson was served with the Notice to Correct on May 20.

Richardson apparently filed a grievance on June 11, disputing the basis and accuracy of the Notice to Correct.[3] The grievance was partially granted with respect to the wording of the Notice, which Lopez accordingly revised on October 31.

On June 7, Employee Relations Administrator Commander Jeri Weinstein sent a note to MacArthur stating she did not "concur that sufficient justification exists to support the deselection of Sergeant Richardson. While the act that led to this request is worthy of censure, Sergeant Richardson's past performance reflected in his Standards Based Assessments supports his retention of the advanced paygrade position. [¶] I do, however, support the administrative transfer of Sergeant Richardson. His actions have damaged his relationship with the division's leadership team and would hinder his effectiveness at Newton Area. It is in the best interests of the employee and the Department for him to be transferred to another command." MacArthur, who makes the ultimate decision on requests for demotions or downgrades, wrote on the note, "I do concur so please move forward."

MacArthur testified that in making her determination, she reviewed Richardson's employment history, the "15.2 request" from Lopez, i.e., his Intradepartmental Correspondence dated May 19, Richardson's Occupied Locker notice and e-mailing of that notice, photos of the lockers, and Weinstein's note. She also considered Richardson's prior administrative transfer from Rampart to Newton, which was requested

---

[3] Only the response to this grievance, not the grievance itself, is in the record.

by then-Captain Charlie Beck in December of 2003. Beck's Intradepartmental Correspondence requesting the transfer stated Richardson had been "loaned" from Rampart to Newton in November of 2002 based upon "Richardson's perceived negative attitude in the area of change and reform. Specifically, he was viewed as a strong peer group leader who was not embracing the positive steps being taken at Rampart Area in light of the recent highly publicized incidents surrounding the former CRASH Unit." MacArthur also met with Weinstein and discussed the matter.

MacArthur explained that she decided the downgrade and transfer were appropriate because Lopez had a right to conduct a locker audit and Richardson, "instead of voicing his concern to the commanding officer, . . . he chose to do something that is not very leadership oriented, supervisory oriented, and post an e-mail, what I believe to be very unprofessional, notice about his locker and why he didn't think this was appropriate. [¶] And in terms of what a supervisor is supposed to do, a supervisor is supposed to follow legal orders, and this was a legal order from his commanding officer. . . . And so, therefore, I didn't feel that this is a person who should be in an assistant watch commander position." She thought an immediate downgrade was warranted because Richardson "chose to make this a very public issue . . . very public with our officers, rather than following the process. And he also had a history, similar incident, not exactly the same, and I agree with that. [¶] But also another time as a supervisor where he chose an unusual avenue of complaining about things. And to me that's not the kind of individual we need sitting in a watch commander's seat supervising in the absence of the watch commander."

Richardson was ultimately downgraded to Sergeant I and transferred to Southwest Division, effective August 14, by an order of Chief of Police Charlie Beck dated August 1.

### 3. The administrative appeal

Richardson filed an administrative appeal of the downgrade and transfer on August 25. The hearing was not conducted until March 21, 2013. On April 1, 2013, the

7

hearing officer, LAPD Captain Bill Hart, issued his written recommendation that the Chief of Police uphold the downgrade and transfer. In setting forth the basis for his findings and recommendations, Hart stated "[t]here is no question" that the Occupied Locker notice was "completely inappropriate and unprofessional, and that by writing and displaying it, Richardson demonstrated poor judgment, a lack of respect for his co-workers, a lack of support for his commanding officer, and disregard for the legitimate operational needs of the Newton Patrol Division." Hart further noted: "This type of behavior clearly undermined the chain of command, hampered the ability of the Division to achieve its goals, and contributed to an atmosphere of conflict and inefficiency. . . . Richardson's posting of his 'Occupied Locker Notification' . . . clearly emboldened others to ignore the directions of Sergeant Von Voight [*sic*] and, by extension, their Commanding Officer."

Hart stated: "Department Manual Section 3/763.55, which was in effect at the time of the incident . . . allows for reassignment to a lower paygrade when an officer clearly demonstrates his/her ***failure*** to satisfactorily perform the duties of the position. By the single act of posting his threatening Occupied Locker Notification, Richardson failed to display the professionalism, leadership, loyalty and respect for others expected of any Department supervisor, particularly one in a position of increased authority. Sergeant Richardson was an influential leader at Newton Patrol Division, and his actions were watched and emulated by many of his peers and subordinates. While the note may have been intended as a joke, Captain Lopez testified that it was perceived as a challenge to his authority and that it had a detrimental effect on the Newton chain of command. Richardson's relationship with other members of the Newton leadership team was damaged, his effectiveness diminished, and the trust of his commanding officer was lost. [¶] [Richardson] argued he was not provided with training and given an opportunity to improve. However, as Assistant Chief MacArthur testified, an experienced Department supervisor should not need special training in order to follow lawful orders, and neither counseling nor training would undo the damage that had already been done. Under

8

circumstances such as these, an immediate reassignment to a lower paygrade and administrative transfer were in the best interests of the Department, and were authorized under Manual Section 3/763.60 . . . ."

**4.       Denial of the petition for writ of mandate**

In denying Richardson's writ petition, the trial court rejected each of the claims raised in this appeal, as well as a sufficiency of evidence claim.

## DISCUSSION

Richardson's contentions fall into two basic categories:  procedural error and excessiveness of the penalty.

**1.       Procedural error claims**

In 2009, the LAPD issued Special Order 47, which revised volume 3, section 763.55 of the LAPD manual and deleted volume 3, section 763.60.  In 2012 the LAPD was enjoined from applying Special Order 47 to employees, such as Richardson, who attained their advanced paygrades before the issuance of Special Order 47.  The injunction was affirmed on appeal.  (*Los Angeles Police Protective League v. City of Los Angeles et al.* (May 16, 2013, B241386) [nonpub. opn.].)

The 2008 version of section 763.55 provided, in pertinent part:  "An officer below the rank of lieutenant in an advanced paygrade position may be reassigned to a lower paygrade position within his/her classification when one of the following conditions exist:  [¶]  . . .  [¶]  When an officer clearly demonstrates his/her failure or inability to satisfactorily perform the duties of the position."

Section 763.60 provided, in pertinent part:  "When an officer's immediate supervisor becomes aware that the officer is not satisfactorily performing the duties of his or her advanced paygrade position, the supervisor shall, without delay, counsel the officer regarding deficiencies; complete a Notice to Correct Deficiencies, Form General 78; and cause the form to be approved and distributed.  When the officer continues to demonstrate a failure to satisfactorily perform the duties of the position, the officer's commanding officer shall:

"• Cause the completion of a Performance Evaluation Report . . . , Form 01.78.00;

"• Complete a Request for Transfer and/or Change in Paygrade, Form 01.40.00;

[¶] . . . [¶]

"• Complete an Intradepartmental Correspondence, Form 15.02.00, citing the reasons for recommending reassignment to a lower paygrade . . . and include a statement that the officer was advised of the right to provide a written response to the proposed personnel action within 30 days of the date of Notice;

"• Provide the employee copies of the documents; [¶] . . . [¶]

"• After receiving a written response (or 30 days have passed, without a response), attach the original written response to the 15.2 [*sic*] and forward all documentation through channels to the Director, Officer of Support Services. A copy of the officer's response shall be attached to the officer's Performance Evaluation Report, which shall be filed in the officer's personnel files.

"**Exception:** When an officer clearly demonstrated failure or inability to satisfactorily perform the duties of his or her advanced paygrade position, indicate [*sic*] the need for an immediate reassignment in the best interests of the Department, the commanding officer shall temporarily place the officer in a lower paygrade assignment and shall, without delay, forward a Form 15.02.00, and a Form 01.40.00 through channels to the Director, Officer Support Services. The officer shall receive the same paygrade salary pending the concurrence of the Director, Officer Support Services, in the recommendation that the officer be reassigned to a lower paygrade."

Section 763.55, as modified by Special Order 47, incorporated most of the procedural requirements set forth in section 763.60, but allowed reassignment to a lower paygrade when "[a] commanding officer, in his or her discretion, decides that reassignment is appropriate after determining that a subordinate officer has been unwilling or unable to perform the duties of the position" or "that a subordinate officer committed an act that merits the reassignment to a lower paygrade position."

10

The parties agree that the LAPD was required to apply the 2008 provisions to Richardson. Richardson contends he was entitled to a writ reversing his downgrade and transfer because the LAPD applied the provisions in effect in 2011. The LAPD concedes on appeal that Lopez applied the 2011 rules, but argues any error was cured by Hart's application of the 2008 standards in the administrative appeal and Richardson suffered no prejudice. Richardson argues that he is not required to show prejudice, and an administrative appeal "cannot be used to grant the Department an opportunity to consider whether the downgrade could have hypothetically been justified under a different theory, the procedure for which was not followed in fact." Richardson further argues the LAPD did not, in fact, comply with the requirements of section 763.60.

### a. Standard of review and requirement of prejudice

"An *appellate* court applies the following standards of review to a trial court's denial of a petition for a writ of administrative mandamus. First, if the trial court exercised its independent judgment, we review the record to determine whether the court's factual findings are supported by substantial evidence, resolving all evidentiary conflicts and drawing all legitimate and reasonable inferences in favor of the court's decision. [Citations.] Second, 'to the extent pure questions of law (e.g., jurisdiction) were decided at the trial court upon undisputed facts, a de novo standard will apply at the appellate level.'" (*Cassidy v. California Bd. of Accountancy* (2013) 220 Cal.App.4th 620, 627, fn. omitted (*Cassidy*).)

Although the trial court exercised its independent judgment, the issue of whether the LAPD's actions conformed to the 2008 rules is a question of law, which we review de novo. (*Yaqub v. Salinas Valley Memorial Healthcare System* (2004) 122 Cal.App.4th 474, 483.)

Richardson's claim that any procedural error requires reversal without regard to whether it was prejudicial is simply incorrect. First, Code of Civil Procedure section 1094.5, subdivision (b), which governs resolution of a petition for a writ of administrative mandate provides: "The inquiry in such a case shall extend to the questions whether the

11

respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." "This does not mean that any legal mistake at the administrative hearing level compels the finding to be set aside. Instead, as a general rule, 'procedural due process violations, even if proved, are subject to a harmless error analysis.' [Citation.] 'A writ of administrative mandamus will not be issued unless the court is persuaded that an abuse of discretion was prejudicial. [Citation.] In other words, the reviewing court will deny the writ, despite abuse of discretion, if the agency's error did not prejudicially affect the petitioner's substantial rights.'" (*Thornbrough v. Western Placer Unified School Dist.* (2013) 223 Cal.App.4th 169, 200.) The petitioner bears the burden of showing that it is reasonably probable a more favorable result would have been reached absent the error. (*Ibid.*) Moreover, in accordance with the usual appellate rules, one who appeals the denial of a petition for a writ of administrative mandate must show that the procedural error resulted in a miscarriage of justice. (*Ibid.*; *Leal v. Gourley* (2002) 100 Cal.App.4th 963, 968.)

The cases Richardson cites for the proposition that he is not required to show prejudice all involved public employees who were summarily discharged or demoted without the employer even attempting to follow any of the procedures it had adopted to govern such action, which conduct is patently prejudicial. (*Currieri v. City of Roseville* (1970) 4 Cal.App.3d 997, 1001 [discharge without any hearing]; *Birdsall v. Carrillo* (1991) 231 Cal.App.3d 1426, 1428 [demotion without adequate notice of deficiencies or opportunity to respond or appeal]; *Santos v. City of Brawley* (1984) 162 Cal.App.3d 203, 207 [city council that fired police chief later held hearing on the discharge, but did not provide binding third-party arbitration as its resolution required].)

**b.**     **Degree to which process utilized conformed to 2008 rules**

Although Lopez relied upon the 2011 version of section 763.55 in his "Intradepartmental Correspondence" requesting a downgrade and administrative transfer of Richardson, he testified at the administrative appeal hearing that he considered "various" sections from the LAPD manual and that the process he followed also complied with the 2008 provisions. He further testified that the "Exception" portion of section 763.60 (from the 2008 manual) applied to Richardson's case.

A review of the 2008 and 2011 provisions of the manual reveals that the standards and procedures Lopez employed satisfied the 2008 provisions. First, the ground for a downgrade, as relevant here, is essentially the same: "an officer clearly demonstrates his/her failure . . . to satisfactorily perform the duties of the position" (2008 version of 763.55) and "the officer is not satisfactorily performing the duties of his or her advanced paygrade position" (2011 version of 763.55). Any difference is, at most, one of degree, i.e., whether the officer's conduct *clearly* demonstrates unsatisfactory performance. Assuming, for the sake of argument that there is a difference and that such difference in degree created error, Richardson has not demonstrated prejudice, i.e., that he would not have been downgraded and transferred had Lopez applied the "clearly demonstrates" standard.

Richardson argues he was prejudiced because he was not provided the protections of being counseled and given an opportunity to correct his deficient behavior before being downgraded, as set forth in the first paragraph of section 763.60. However, counseling and a second chance were not required under section 763.60's exception, which applied when the officer's "clearly demonstrated failure or inability to satisfactorily perform the duties of his or her advanced paygrade position" indicated "the need for an immediate reassignment in the best interests of the Department." Lopez's testimony established that Richardson's conduct created discomfort and concern within the management of the Newton Division, discord within the subordinate ranks, and a challenge to Lopez's authority. Lopez feared Richardson would also disregard or defy

other orders and directives and was no longer able to trust Richardson. When asked to explain "how Sergeant Richardson clearly demonstrated failure or inability to satisfactorily perform his duties," Lopez testified, "I felt that as a sergeant of police, as an assistant watch commander that had already been put on notice that his activity or his document that he submitted was inappropriate and unprofessional, that to continue to keep him at that position, despite the fact that he had already been warned and advised, was detrimental to the command and to the division." All of this supports Lopez's testimony that the exception to section 763.60 was applicable to Richardson's circumstances. Richardson's failure to establish any basis for concluding that Lopez would not have applied the exception undermines his prejudice argument.

Richardson's remaining prejudice argument is that if he had known Hart would conclude section 763.60's exception applied, he "might have prepared to defend himself differently" at the hearing on his administrative appeal. Leaving aside the speculative nature of this argument, it fails to demonstrate how he was prejudiced by application of the 2011 rules, as opposed to the 2008 rules. Notably, section 763.60 is part of the 2008, not the 2011 rules, i.e., the rules Richardson claims should have been applied to him. In essence, he argues he was prejudiced by the failure to apply the first paragraph of section 763.60 because Hart concluded the exception paragraph of the same rules would have been applicable. Moreover, the hearing was conducted after the LAPD was enjoined from applying the post-Special Order 47 provisions to officers like Richardson, and both the questioning of Lopez at the hearing and Hart's decision reveal that all parties were aware that the 2008 procedures were to be applied to Richardson. Thus, Richardson knew or should have known that all portions of section 763.60 were potentially applicable to him.

In contrast to Richardson's failure to demonstrate prejudice, the administrative record strongly suggests the absence of any prejudice. Lopez's testimony regarding the effects of Richardson's Occupied Locker notice and his explanation in his Intradepartmental Correspondence requesting the downgrade and transfer that

14

"Richardson's demeanor is not what is expected of a senior supervisor who has responsibility to guide, train, direct, and motivate those over whom he has control" strongly suggest the result would have been exactly the same had Lopez followed the 2008 standards.

### c. Claim that the LAPD did not comply with section 763.60

Richardson argues the LAPD failed to comply with either the "general method" or the exception in section 763.60. Failure to comply with the "general method," i.e., the steps set forth above the exception, is irrelevant because, as previously noted, the exception applied. Accordingly, we address only Richardson's argument regarding failure to comply with the exception.

Richardson first argues his conduct did not necessitate immediate reassignment, as the exception requires. In support, he cites a statement in Hart's decision that Richardson "is quite capable of serving as an Assistant Watch Commander," and Weinstein's note to MacArthur stating Richardson's "past performance . . . supports his retention of the advanced paygrade position." Richardson thus argues the "uncontroverted evidence in the record" shows he is "capable of performing the duties of his advanced paygrade position." The exception in section 763.60 applies to either "failure or inability to satisfactorily perform the duties" of an advanced paygrade position, however. Richardson's downgrade was based upon a failure to satisfactorily perform, as Hart's decision stated in the paragraph immediately following the portion Richardson cites: "Department Manual Section 3/763.55, which was in effect at the time of the incident . . . allows for reassignment to a lower paygrade when an officer clearly demonstrates his/her *failure* to satisfactorily perform the duties of the position. By the single act of posting his threatening Occupied Locker Notification, Richardson failed to display the professionalism, leadership, loyalty and respect for others expected of any Department supervisor, particularly one in a position of increased authority." Although Hart cited section 763.55, the exception in section 763.60 uses the same language.

15

Richardson further argues the LAPD's failure to temporarily place him in a lower paygrade assignment and to "act 'without delay' in" submitting the required paperwork, instead allowing him to remain in his advanced paygrade position for three months, demonstrates the LAPD "did not believe his conduct was so severe as to require immediate removal." The record does not establish several key elements of Richardson's argument. First, Lopez testified that after investigating the incident and deciding upon the best course of action, he removed Richardson as an assistant watch commander and reassigned him to other duties. The exception in section 763.60 states "the commanding officer shall temporarily place the officer in a lower paygrade *assignment*," (italics added) not temporarily place the officer in a lower paygrade. Indeed, the exception also requires that the officer "receive the same paygrade salary pending the concurrence of the Director, Office of Support Services, in the recommendation that the officer be reassigned to a lower paygrade." As far as the record reveals, removal of Richardson as an assistant watch commander and assigning him other duties constitutes a temporary placement "in a lower paygrade assignment." Even if Lopez could, somehow, have reduced Richardson's paygrade without proceeding through the proper bureaucratic channels, such an action would probably have resulted in Richardson receiving a reduced salary, which would contravene the exception's requirement that the officer "receive the same paygrade salary pending the concurrence of the Director, Officer Support Services, in the recommendation that the officer be reassigned to a lower paygrade."

Next, the delay between Richardson's posting of the Occupied Locker notice and his eventual downgrade to Sergeant I also fails to demonstrate that the LAPD did not consider his conduct to require his "immediate reassignment in the best interests of the Department." First, we note that Richardson describes the pertinent time period as May 6 to August 14. Although Richardson's Occupied Locker notice included the May 6 date and the administrative record indicates he e-mailed it to Von Voigt and Jaye that day, it further reveals that Von Voigt did not read the e-mail until May 9. Because Von Voigt was the person who brought the notice to Lopez's attention, the record supports a

16

reasonable inference that Lopez did not find out about the notice until May 9. In addition, although Richardson's downgrade was effective August 14, the Chief of Police ordered the downgrade August 1. Thus, the length of time in controversy is less than three months.

Using the May 9 commencement date, Lopez submitted the paperwork to effectuate the downgrade 10 days after learning of Richardson's misconduct, during which time he investigated the incident, spoke to Richardson and others about it, consulted with the Employee Relations Group and the assistant chief about the appropriate course of action, removed Richardson from assistant watch commander duties, and prepared the paperwork. Perhaps Lopez could have accomplished all of this in a shorter period, but his testimony provided an explanation for any delay. He was, in essence, investigating the facts and assuring himself that Richardson's conduct demonstrated a failure to perform the duties of his position satisfactorily, thus warranting downgrade and transfer. Once Lopez submitted paperwork, the downgrade and transfer process was underway, but, as he testified and as illustrated by the administrative record, "[i]t took the Department some time to move him." This is not surprising, given that the request had to work its way through bureaucratic channels and be approved by various high-ranking officials in the LAPD. MacArthur testified that a request for downgrade "goes through the proper chain of command of the involved employee," then through the Employee Relations Group, "then it comes to me for final review." Even Weinstein's note bears numerous date stamps reflecting that it was sent from office to office within the LAPD. As the record also illustrates, the final decision or action accomplishing the downgrade was an order by the Chief of Police on August 1. It thus appears that the period between Richardson's misconduct and his actual downgrade resulted from careful consideration of how the LAPD should proceed and, mostly, the bureaucratic process itself. Clearly the delay between Richardson's misconduct and his paygrade reduction benefited him, as he continued to earn a higher salary during this period.

17

In a largely overlapping argument, Richardson argues the LAPD did not comply with the procedural requirements of section 763.60's exception because his paygrade was not immediately reduced and Lopez only requested his downgrade, but did not forward forms 15.02.00 and 01.40.00 through channels to the Director of the Office of Support services, as the exception requires. Richardson is wrong. First, as we just stated in relation to Richardson's overlapping argument, the exception in section 763.60 states "the commanding officer shall temporarily place the officer in a lower paygrade *assignment*" (italics added), not temporarily place the officer in a lower paygrade. As far as the record reveals, removal of Richardson as an assistant watch commander and assigning him other duties constitutes a temporary placement "in a lower paygrade assignment." Second, the papers Lopez prepared and submitted "through channels" were forms 15.02.00 and 01.40.00. The "Transfer and/or Change in Paygrade" form Lopez submitted indicates in its lower left corner that it is "1.40.00." A paragraph of section 763.60 prior to the exception refers to "Intradepartmental Correspondence, Form 15.02.00," and MacArthur referred in her testimony to Lopez's Intradepartmental Correspondence document dated May 19 as a "15.2." Finally, as previously addressed and expressly reflected in the terms of section 763.60, Lopez could not personally reduce Richardson's paygrade. Rather, the actual downgrade had to be accomplished by submitting the required paperwork requesting such a downgrade, and that paperwork had to go "through channels" all the way to MacArthur and, ultimately, the chief of police to effectuate the downgrade.

## 2. Excessive penalty claim

"[W]e review de novo whether the agency's imposition of a particular penalty on the petitioner constituted an abuse of discretion by the agency," focusing on "'the correctness of the agency's decision rather than that of the trial court.'" (*Cassidy*, *supra*, 220 Cal.App.4th at pp. 627, 633.) "[W]e will not disturb the agency's choice of penalty absent '"an arbitrary, capricious or patently abusive exercise of discretion"' by the administrative agency." (*Id.* at pp. 627–628.) "'"*Neither an appellate court nor a trial*

18

*court is free to substitute its discretion for that of the administrative agency concerning the degree of punishment imposed.* [Citation.]" [Citation.] [¶] "In reviewing the exercise of this discretion we bear in mind the principle 'courts should let administrative boards and officers work out their problems with as little judicial interference as possible . . . . Such boards are vested with a high discretion and its abuse must appear very clearly before the courts will interfere.'"" [Citation.] 'The policy consideration underlying such allocation of authority is the expertise of the administrative agency in determining penalty questions.'" (*Id.* at p. 633.) "In considering whether such abuse occurred in the context of public employee discipline, we note that the overriding consideration in these cases is the extent to which the employee's conduct resulted in, or if repeated is likely to result in, '[h]arm to the public service.' [Citations.] Other relevant factors include the circumstances surrounding the misconduct and the likelihood of its recurrence." (*Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 218.)

After thoroughly reviewing the administrative record, we conclude the LAPD did not abuse its discretion by downgrading and transferring Richardson. That Richardson's conduct resulted in harm to the public service is persuasively demonstrated by the testimony of Lopez regarding both the reasons Richardson's posting and display of the Occupied Locker notice demonstrated a failure to conform to the duties and standards required of an assistant watch commander and the effects of Richardson's conduct, including division of subordinates and Lopez's loss of trust that Richardson would carry out his orders and directives. Harm to the public service is also shown by the testimony of MacArthur regarding her reasons for approving the downgrade and transfer and by Hart's written opinion describing how Richardson's misconduct "undermined the chain of command, hampered the ability of the Division to achieve its goals, . . . contributed to an atmosphere of conflict and inefficiency," "emboldened others to ignore the directions of Sergeant Von Voight [*sic*] and, by extension, their Commanding Officer," and "had a detrimental effect on the Newton chain of command."

Although Richardson argues it was a "one-time practical joke questioning an order" and that he is unlikely to repeat the conduct, MacArthur's testimony regarding Richardson's prior transfer out of Rampart for perceived resistance to departmental or command directives undertaken to improve operations of that division, with apparent concern for Richardson's influence as "a strong peer group leader," both reveals and supports the LAPD's concern about Richardson's tendency to disobey lawful orders by his superiors. Lopez testified that the duties of an assistant watch commander included carrying out and adhering to the directions of command staff and of the LAPD and serving as a positive example to subordinate officers. Richardson's Occupied Locker notice demonstrated additional resistance to lawful commands and justifiably caused Lopez, MacArthur, and others in the LAPD concern that Richardson would not only refuse or fail to carry out orders and directives of his superiors, but that he would influence his subordinates—for whom he served as a role model and over whom he had strong influence—to do the same. "[P]olice officers 'are the guardians of the peace and security of the community, and the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties and are faithful to the trust reposed in them.'" (*Hankla v. Long Beach Civil Service Com.* (1995) 34 Cal.App.4th 1216, 1224.) Willful disobedience and insubordination cause harm to the public service. (*County of Santa Cruz v. Civil Service Commission of Santa Cruz* (2009) 171 Cal.App.4th 1577, 1583; *Barber v. State Personnel Bd.* (1976) 18 Cal.3d 395, 404.)

We cannot conclude Richardson's downgrade and transfer constituted an arbitrary, capricious, or patently abusive exercise of discretion by the LAPD.

20

## DISPOSITION

The judgment is affirmed.  Each party is to bear its own costs on appeal.

NOT TO BE PUBLISHED.


                                                    LUI, J.

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.

21